## Maulding v. Commonwealth.

(Decided November 23, 1916.)

### Appeal from Monroe Circuit Court.

1. Homicide—Involuntary Manslaughter—Instruction on Subject of.— Involuntary manslaughter is shortly defined to be the killing of another in doing some unlawful act, but without an intention to kill; so that in all cases in which it is sought to have an involuntary manslaughter instruction, it should appear from all the facts and circumstances that the intention to kill the person assaulted, or struck, or wounded, was lacking. If the intention to kill is present, the doctrine of involuntary manslaughter has no place in the case.

2. Homicide—Involuntary Manslaughter—Instruction on Subject of. —On this issue the material inquiry in every case is whether the killing was done with malice and intent to kill, and not the manner by or through which it was done, or whether the implements used were deadly weapons or not.

3. Homicide—Involuntary Manslaughter—Instruction on Subject of.— Where the undisputed facts show that the accused  beat  and bruised the deceased in such a brutal manner as to leave no room to doubt that he did intend to kill him, an instruction on the subject of involuntary manslaughter should not be given.

4. Homicide—Involuntary Manslaughter—Instruction on Subject of.— If, however, the facts and surrounding circumstances reasonably show a lack of intention to kill, an instruction on the subject of involuntary manslaughter should be given.

5. Homicide—Insanity—When Instruction on Subject of Should be Given.—The rule in this state is that where there is evidence tending to sustain the plea of the accused that he was of unsound mind, the court should not take the case from the jury by refusing to give an instruction on this issue.

6. Homicide—Insanity—Non-Expert Evidence.—The opinion evidence of intimate friends and acquaintances, as to the soundness or unsoundness of mind of the accused, is competent, although they are not experts.  But the evidence of non-experts is permissible only upon the theory that by long association and observation they

have had an opportunity to form an opinion as to the sanity or insanity of the accused, and this opinion they may give, as well as the facts upon which it is based.

7. Homicide—Insanity—Instruction on Subject of.—When the defense of insanity is set up as an excuse for crime, there should be some tangible evidence in support of the plea. The non-expert witnesses who testify on the subject must have had an opportunity to observe the manners, habits and course of conduct of the accused through such a period of time as would enable them to come to a fair conclusion as to his 'mental condition.

8. Homicide—Insanity—Instruction on Subject of.—A person who sees a man only a few times and who has no intimate acquaintance or long association with him, is not qualified to express the opinion that the man is or is not of unsound mind.

9. Homicide—Insanity—Instruction on Subject of.—So that the mere expression of opinion that a person is or is not of sound mind, unless the opinion has been formed from information based on extended observation, acquaintance or association, is not admissible.

10. Homicide—Insanity—Instruction on Subject of.—The fact that the accused is unlearned, passionate, ignorant, or even of a weak mind, will not justify an instruction on the subject of insanity.

JACKSON & DENHAM and SHERMAN SPEAR for appellant.

M. M. LOGAN, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

Under an indictment charging him with the murder of Barney Nickols, the appellant Maulding was found guilty and his punishment fixed at imprisonment for life. The chief and, in fact, only substantial ground upon which a reversal is asked is that the court committed prejudicial error in failing to give instructions on involuntary manslaughter and insanity.

The correctness of the instructions given must be tested by the evidence, and so before setting out the instructions given and taking up the question as to others that counsel urge should have been given, we will look to the evidence, which is substantially as follows:

Maulding, a married man about 37 years old, strong and healthy, was living at the time of the homicide at the house of Cate Nickols, the father of Barney Nickols who was killed. On Sunday evening about dark Maulding and Barney Nickols left the house to go after a cow, and Cate Nickols, who was sitting on his porch a

short distance from the yard gate which opened on the public road, said that he saw Maulding jerk Barney through the gate and out into the road, and presently saw Maulding stamping and beating him. That he was crippled and not able to go out to the road where his boy was being killed. That there were rocks and rails and pieces of wood out in the road around where Maulding and Barney were. That Barney was a delicate man, and a humpback. This witness further testified that although he knew Barney was beating his son, he did not know he had killed him until a little while after the assault. That in the meantime and before he found out that his son had been killed, Maulding came back in the house and soon afterwards in company with his wife and children left the premises.

Barney Wheat, who drove by, saw Barney Nickols lying on the side of the road but did not know that he was dead. He also met Maulding a short distance from Barney and observed that his hands were bloody, but did not have any conversation with him.

Frank England, who appeared on the scene a little while after Wheat had left, found Barney lying on the side of the road, dead. His face and head and ears were horribly mashed and bruised. This witness did not know what kind of an instrument the wounds on the head and face were inflicted with, but said that from their appearance the wounds were caused by striking him with a club or stamping him with the heel of a shoe.

Other witnesses also testified as to the mutilated condition of Nickols. Leonard Wheat testified that some time before this Maulding told him that Barney had been in the habit of getting drunk and that "he was going to put a stop to it one way or another," and that "if he could not do it one way, he would do it in another and kill him."

John Wheat also testified that about a month before the killing he heard Maulding threaten to kill Barney Nickols, saying that "if he did not quit his cutting up he would stamp his head off," and also told him that "he had knocked Barney Nickols down and he had a notion of stamping his head off then."

Irvin Hall, another witness, said that the day after the killing he heard Maulding say that "he had hit Barney three times, knocked him down and laid him on the other side of the road."

S. T. Hagan, sheriff of the county, said that the day following the killing, Maulding told him he did not know anything about it. That he did not do it. That he further told him that "they had had some trouble or short words and agreed to disagree, and he decided to move away and leave them."

W. G. Strode, the jailer, said that he had talked a good many times with Maulding in jail and noticed him closely, and in an answer to the question, "I will ask you if he is a man of ordinary sense," he replied, "I don't think he is." He further said that he did not know whether his conduct in jail was real or assumed, that sometimes he would be in a rage and then again very humble. Asked if he was not afflicted with melancholia, he answered, "Seems like he is a little that way."

Maulding, in his own behalf, after testifying that he lived at Cate Nickols' house, was asked, "Did you have a difficulty with Barney Nickols in which you killed him? A. Yes, sir; he had a difficulty with me. Q. Did he raise a difficulty with you? A. Yes, sir. Q. Tell the jury what you hit him with. A. My fist. Q. How many times? A. Three or four times. Q. Did you hit him with a stick or rock or fence rail or stamp him? A. No, sir. Q. What was his condition? A. About half drunk. Q. I will ask you if you know of any trouble that occurred between your wife and Barney Nichols in the kitchen there that evening? A. Yes, sir; he said that if she did not do what he wanted her to do he would tear every rag of her clothes off. Q. Did he do that? A. Yes, sir. Q. How did you know that? A. My wife told me that evening. Q. Had he ever made any indecent proposals to her before that? A. Yes, sir. Q. Who told you that? A. She did. Q. How long was that before this? A. Two weeks. Q. Where was Barney when you started after your cow? A. He was right behind me, hitting me in the back and calling me all kinds of s—s of b—s. Q. What was he hitting you with? A. His fist. Q. How far did he follow you? A. Through three rooms and down the road about thirty steps before I hit him. He said, 'You G— d— s— of a b—, I will take my knife and kill you,' and he run his hand in his pocket, and I knocked him down and hit him three or four times. Q. Did you know at that time that you had killed him? A. No, sir. Q. Did you pick him up and

lay him out of the road? A. I moved his feet out of the road.

"Q. Where did you go? A. I went after my cow and my wife went with me. Q. Tell the jury whether or not you had a lightning stroke or was shocked by lightning some years ago. A. Yes, sir; 17 years ago. Q. How did that affect you? A. I didn't know anything for three days and three nights. I have not been right since and still feel the effects of it. Q. Did you feel the effects of it the day you killed Barney? A. I do all the time. There are times I don't know much.

"Q. You killed Barney Nickols? A. I don't know whether I did or not. If I did I did not aim to do it. Q. You knocked him down the first time you hit him? A. Yes, sir; I stooped over and hit him again. Q. What did you hit him the second time for? A. I was mad. I didn't know what I was doing. Q. How do you know you did not kick him? A. I know I didn't. Q. How long before you knocked him down did your wife tell you that he had assaulted her? A. About twenty minutes. Q. What did you hit him for? A. Because he insulted my wife and called me all kinds of s—s of b—s and got his knife nearly out."

Beckham Maulding, his son, also testified that he saw Barney slapping his father out at the gate and also saw him put his hand in his pocket just before his father hit him.

John Jackson said that he knew Maulding. "Q. Tell his actions generally. A. I have seen smarter people than him. Q. From your observation of him, would you regard him as being a man of sound or unsound mind? A. I never thought him to be exactly right by his actions." He also said that he examined the wounds on the face and head of Barney and discovered the print of a shoe heel with tacks in it.

John Owens was asked, "Q. Have you seen him and been with him and observed his talk and actions and conduct generally to such an extent that you could tell the jury whether you regarded him as a man of sound or unsound mind? A. He did not seem right to me."

Bob Fish testified that he was acquainted with Ike Maulding and lived about a mile from him at the time he killed Barney Nickols. Asked if he was sufficiently acquainted with him, his acts, conduct and talk so as to tell the jury whether he was a man of sound or unsound mind, he answered: "Yes, sir; I didn't regard him as

a man of sound mind. Q. What actions have you seen that would lead you to believe that he was not a man of sound mind? A. He would work a little and then look around and not act right. Q. What would he do when you would talk with him? A. Sometimes he would talk and sometimes he would not. Q. What else have you seen him do to indicate that he was a feeble-minded man? A. He never looked right. Q. He had sense enough to kill Barney Nickols? A. I guess he did. Q. He knows right from wrong? A. Yes, sir. Q. Could you tell whether he was mean or feeble-minded? A. I could not.''

Dr. Walden was introduced as an expert and expressed the opinion that if a person received a shock from lightning it would affect his nervous system; and in answer to a hypothetical question said that he "would not consider him to be thoroughly at himself.'' Asked if he was an alienist, he answered, "I don't know what you mean. Q. You are not an expert in any line? A. No, sir.''

Upon this evidence the court instructed the jury that if they believed beyond a reasonable doubt that Maulding "with his malice aforethought wilfully and unlawfully struck with his fists, rocks, clubs, or other weapon or weapons and mortally wounded Barney Nickols, from which striking and wounding said Nickols died within a year and a day,'' they should find the defendant guilty of murder and fix his punishment at confinement in the penitentiary for life or at death, in their discretion.

In another instruction they were told that if they believed Maulding "in sudden affray, or in sudden heat and passion, and under such provocation as excites passion beyond control, without previous malice and not in self-defense, wilfully and unlawfully struck with his fists, rocks or sticks, or other hard substances Barney Nickols, from which striking, beating and mortally wounding Nickols died within a year and a day,'' they should find the defendant guilty of voluntary manslaughter.

In another instruction the law of self-defense was presented, and in yet another the subject of reasonable doubt was submitted.

There is no evidence in the case that Maulding struck or killed Nickols with a rock, club or other implement. On the contrary, it is clearly shown by direct

evidence, as well as by reasonable inference therefrom, that Maulding struck and knocked down Barney Nickols with his fist, and then stamped him in the head and face with the heel of his shoe until he had killed him. It is therefore insisted that as neither the hands nor the feet of a person are deadly weapons within the meaning of the law, and because Maulding testified that he did not intend to kill Nickols, an instruction on the subject of involuntary manslaughter should have been given. In support of this contention the case of Thomas v. Com., 27 Ky. L. R. 794, is relied on. It appears from the opinion in that case that Thomas, after previously threatening to kill the woman he was living with, knocked her down with his fist and kicked her several times in the stomach, side and face, and that she died from the effects of the injuries inflicted by him. The court refused to give an instruction on the subject of involuntary manslaughter, and, in holding that such an instruction should have been given, the court said:

"In this case the injuries were inflicted by the hands and feet of the appellant. These are not deadly weapons within the meaning of the law, and when death results unintentionally from their use in an assault, the result is not murder, but involuntary manslaughter. But if appellant intended to kill his mistress, or if from the manner and use of his fists and feet, considering the relative size and strength of the parties, what he did was calculated to produce death or great bodily harm, then the jury would have the right to find him guilty of murder. As to whether or not murder or involuntary manslaughter resulted from the acts of appellant was a question for the jury to determine under all the circumstances of the case and, therefore, the refusal of the court to instruct as to involuntary manslaughter was prejudicial to his substantial rights."

It may be conceded that this case furnishes support for the contention of counsel that an instruction on involuntary manslaughter should have been given, but we are not disposed to follow the doctrine announced in the Thomas case or apply it to the case we have, and insofar as it may be in conflict with what is said in this opinion, it is overruled. Involuntary manslaughter is shortly defined to be "the killing of another in doing some unlawful act but without an intention to kill:" Conner v. Comlth., 13 Bush 714. A fuller definition may be found

in Trimble v. Com., 78 Ky. 176, and Lewis v. Com., 140 Ky. 652.

So that in any case in which it is sought to have an involuntary manslaughter instruction, it should appear from all the facts and circumstances that the intention to kill the person assaulted, or struck, or wounded, was lacking. If the intention to kill is present, the doctrine of involuntary manslaughter has no place in the case. Thus it was said in York v. Com., 82 Ky. 360:

"One must be presumed to intend the consequences of an act reckless in its disregard 'of human life, and committed under circumstances calculated to endanger it. If death results it cannot properly be said either that it was involuntary homicide or a killing *per infortunium.*" And this is true whether the murder be committed with a knife, pistol or other deadly weapon, or hands or feet. On this issue the material inquiry in every case is whether the killing was done with malice and intent to kill and not the manner by or through which it was done, or whether the implements used were deadly weapons or not. If one person intentionally and maliciously kills another by beating and bruising him in such a manner as Maulding, for example, beat and bruised Nickols, the perpetrator of the crime will not be allowed to excuse himself from the consequences of his acts or to lessen their degree by the mere assertion that he did not mean to kill, when all the circumstances surrounding the transaction disprove his assertion.

In this case there is no question made that Maulding did not kill Nickols, and the undisputed facts show that he beat and bruised and mashed his head and face in such a brutal and horrible manner as to leave no room to doubt that he did intend to kill him. Under these circumstances it would be a travesty on justice for this court to say that an instruction should have been given telling the jury that they might punish Maulding by a mere fine and imprisonment if they believed he did not intend to kill Nickols.

We can, of course, well understand how a case might arise in which an instruction on the subject of involuntary manslaughter should be given. We can easily suppose a case in which a man might in a fit of anger strike another with his fist or kick him without any intention of killing him, although the man struck or kicked might die from the effects of the blow. In such a state of case,

if the facts and surrounding circumstances reasonably showed a lack of intention to kill, an instruction on the subject of involuntary manslaughter would be proper. Illustrative cases on this point are: McGeorge v. Com., 145 Ky. 540; Westrup v. Com., 123 Ky. 95; Hunn v. Com., 143 Ky. 143; Speaks v. Com., 149 Ky. 393; Pash v. Com., 146 Ky. 390.

But where the killing is done in such manner and under such circumstances as to exclude the idea that it was not intended to kill, the crime falls under the definition of murder or voluntary manslaughter, as the case may be, and no instruction on the subject of involuntary manslaughter should be given: Cox v. Com., 158 Ky. 435; Bast v. Com., 124 Ky. 747.

Having these views of the law applicable to this branch of the case, we do not think the court committed error in refusing to instruct the jury on the subject of involuntary manslaughter.

It is further insisted that there was sufficient evidence of mental unsoundness to warrant the court in submitting to the jury an instruction on the subject of the sanity of Maulding. We do not think so. It is true that the rule is very well established in this State that where there is evidence tending to sustain the plea of the accused that he was of unsound mind, the court should not take the question from the jury by refusing to give an instruction on this issue. It is also the settled practice that the opinion evidence of intimate friends and acquaintances as to the soundness or unsoundness of the mind of the accused is competent, although they are not experts. But the evidence of non-experts is permissible only upon the theory that by long association and observation they have had an opportunity to form an opinion as to the sanity or insanity of the accused, and this opinion they may give, as well as the facts upon which the opinion is based, so that the jury may judge for themselves what weight the opinion is entitled to: Abbott v. Com., 107 Ky. 624.

It was said in Brown v. Com., 14 Bush 398, that "When the evidence of non-expert witnesses is offered, the court must be satisfied that the witness has had an opportunity, by association or observation, to form an opinion as to the sanity of the person in reference to whom he is to speak; but, as to the extent and character of the evidence, no better rule can be established than to leave it

within the discretion of the court." The non-expert witness should also, from his observation or association with the accused, or both, be capable of expressing an opinion as to the soundness or unsoundness of his mind, based on facts and circumstances gathered from his observation of the accused.

Measured by these rules, we do not think the evidence offered was sufficient to authorize an instruction upon the subject of insanity. The evidence of Dr. Walden, who was introduced as an expert, was wholly incompetent, because, as shown by his evidence, he was not qualified to express an expert opinion. Nor was the evidence of the other witnesses on this subject, all of which we have set out, sufficient to authorize the giving of an instruction on the subject of insanity. Aside from the statement of Maulding that some 17 years before he was shocked by a stroke of lightning, there is no evidence that he ever had any illness, disease or misfortune that might have affected his mind, or that he was tainted with inherited insanity. Miracle v. Com., 148 Ky. 453. The sum of the evidence on this issue is that Maulding was a man of vicious temper; that he was not "as smart as other people;" that at times he "did not seem right or look right." The only witness who testified that he did not regard him as a man of sound mind was Bob Fish, who was not qualified by intimacy or association to express an opinion on the subject, and even this witness said he could not tell whether he was mean or feeble-minded, and that he knew right from wrong.

When the defense of insanity is set up as an excuse for crime, there should be some tangible evidence in support of the plea. The non-expert witnesses who testify on the subject should be able to give some reasons for their opinion based on the manner, actions or conduct of the accused that they gathered from long acquaintance and association with him. They must have had an opportunity to observe his manners, habits and course of conduct through such a period of time as would enable them to come to a fair conclusion as to his mental condition. A person who sees a man only a few times and who has no intimate acquaintance or long association with him, is not qualified to express the opinion that the man is of unsound mind merely because on some occasions he did or said something, or failed to do or say something, that in his opinion a man of good intelli-

gence and sound mind might have done or said or would not have done or said.

It is a matter of common knowledge that almost every person, at some time or place, and under some circumstances, will do or say things that according to the ordinary rules which govern the conduct, conversation and habits of men of ordinary intelligence, indicate either unsoundness of mind, eccentricity, failing memory or uncommon notions of matters and things. And so if a person happened to see a man of normal disposition and temperament doing or saying things that did not seem to him to be reasonable or right or sensible, he might have and express the opinion that the person under observation was not of sound mind, although, in truth, he may have been a man of fine sense and excellent understanding. But when a person has had opportunity through long acquaintance and association to observe the traits of character of another and his appearance and manner of conduct, he may, by putting together the various incidents that have come under his notice, be able to form a reasonably correct opinion as to whether the person, judged by ordinary standards, is or is not a person of sound mind. And it is only non-expert witnesses of this class who are qualified to express an opinion.

So that the mere expression of an opinion that a person is or is not of sound mind, unless the opinion has been formed from information based on extended observation, acquaintance or association, is not admissible.

No one of the witnesses in this case had such acquaintance or association with Maulding as to qualify him to express an opinion as to his soundness of mind. The witnesses who testified saw him only occasionally, did not know him intimately, and the meager opinions they expressed were formed from slight acquaintance and small opportunity to learn his real mental qualities.

Maulding may have been a person not of strong mind, ignorant and bad-tempered, but, as said in Fitzpatrick v. Com., 81 Ky. 357: ''There is no law which will excuse or palliate a deliberate murder on the ground that the perpetrator of it is unlearned, passionate, ignorant, or even of weak mind, unless the weakness of mind amounts to such a defect of reason as to render him incapable of knowing the nature and quality of his act, or,

if he does know it, that he does not know it is wrong to commit it.

"It is no excuse for murder that the perpetrator has not power to control his actions when aroused or in a passion. It is the duty of men who are not insane or idiotic to control their evil passions and violent tempers or brutal instincts, and if they do not do so, it is their own fault, and their moral and legal responsibility will not be destroyed or avoided by the existence of such passions, or by their conduct resulting from them." Bast v. Com., 124 Ky. 747.

Upon the whole case, we are satisfied the defendant had a fair trial, and the judgment is affirmed.