## Cheatham v. Commonwealth.

(Decided March 1, 1929.)

(Rehearing Denied April 26, 1929.)

R. F. PEAK, SCHINDLER, GUTHRIE & WADE, AMOS WILLIAMS and J. W. CRUME for appellant.

J. W. CAMMACK, Attorney General, and SAMUEL B. KIRBY, JR., Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

Appellant was convicted of the offense of voluntary manslaughter, and sentenced to serve two years in the penitentiary. He has appealed.

The homicide for which appellant was convicted was committed shortly before midnight on May 7, 1927. Earlier in the evening Hood Jones was abroad in the town of Taylorsville in a very drunken condition. He had meandered into pool rooms, restaurants, and other public places, cursing and expressing his desire to engage in a fight. His anger seems to have been particularly directed towards Jim Willoughby and "old man Beckham," who, we gather, were public officers who had theretofore arrested Hood Jones for some offense. Along about 10:30 p. m. Jones went into the restaurant of Dr. A. A. Allen, a former veterinarian. The appellant at that time was in the restaurant with his friends, Alva Ross and Robert Campbell. They were eating a lunch. Jones was very boisterous in the restaurant, and Dr. Allen, in order to preserve the peace in that place, persuaded Jones to leave. Jones still cursing walked out of the restaurant, down the street a little piece, then turned and came back. Just after he left the restaurant the appellant and his friend Ross came out of the restaurant onto the sidewalk and in front of it. Their friend Campbell had not finished eating his lunch, but, instead of waiting for him inside the restaurant, appellant and his friend, although the night was dark and stormy, chose to wait for him outside. While they were standing on the sidewalk Jones approached them, coming from the street onto the sidewalk between two automobiles. He was still cursing in a loud and angry voice. As he came up on the sidewalk towards the appellant he said: "I am the worst God

damn s— of a b—— in the United States. I can whip any s— of a b——." To which the appellant replied: "Well, I am pretty good myself."

There is no dispute in the evidence up to this point. As to what next took place, the evidence for the commonwealth is that appellant, without any further provocation and without Hood Jones doing a thing to him or threatening him, first with his right hand hit Hood Jones on the right jaw, a blow which brought Jones to his knees, and then, as Jones straightened up, hit him on his left jaw with his left fist. This blow stretched Hood Jones out upon the ground. The evidence for the defense is that Hood Jones as he came towards appellant put his right hand in his pocket in a threatening manner, whereupon the appellant hit him in the manner described by the commonwealth's witnesses. No weapon was found upon Hood Jones, nor does the appellant claim he drew any. When Hood Jones was knocked to the ground by the second blow, appellant and his friend Ross re-entered the restaurant and there ate another lunch. After staying about 15 minutes more in the restaurant the two, together with Campbell, came out on the sidewalk and found Jones still lying there. They say that he was then living, and, thinking that he was in a drunken condition and desiring to protect him from the rain which was then falling, they carried him around the corner and laid him in a doorway, and then went about their business. Shortly after midnight a passerby saw the body lying in the doorway, and on summoning assistance he discovered that Jones was dead. It was not known at first how Jones was killed, and, although the town of Taylorsville was much agitated on the following day, which was Sunday, and efforts were made to ascertain how Jones met his death, appellant made no disclosure of any connection he had with it, but went to Shelbyville and stayed there all day. On Monday he went to Bardstown and stayed there all day. When he returned to Taylorsville on Monday night he found that his participation in the fight with Jones had been discovered, and that a warrant had been issued for him. He thereupon surrendered. Later he was indicted for the murder of Hood Jones, the indictment charging that he had killed Hood Jones "by striking and wounding the said Hood Jones in and upon the head, body, arms, limbs and person with a large rock or some other heavy blunt instrument which is to the grand jury unknown a deadly weapon." The evidence for the commonwealth satisfac-

torily establishes that the blows on the jaws of Hood Jones caused his death. But appellant insists that the evidence fails to show that he struck Hood Jones with any rock or other deadly weapon or in any way other than with his bare fists, and because of this he claims that, under the cases of Murphy v. Commonwealth, 226 Ky. 169, 10 S. W. (2d) 626, and Helmerking v. Commonwealth, 100 Ky. 74, 37 S. W. 264, 18 Ky. Law Rep. 576, he was entitled to a peremptory instruction, or, if not, that the verdict was flagrantly against the evidence. While it is true the eyewitnesses to the encounter say either that the appellant struck Hood Jones with his bare fists or that they did not in the dim light see whether there was any rock or weapon in the hands of the appellant or not when he struck Hood Jones, yet the evidence of the doctor, who examined the body of Hood Jones very shortly after its discovery, discloses that there was a skinned place on the forehead and on the nose, the cheek and lip had been cut through, the lower jaws were fractured, and there was evidence of a heavy blow on the right side of the face just at the angle of the jaw. This doctor testified that the force of the blow which fractured these jaws created such an impact on an important nerve which runs from the jaw to the base of the brain as to cause a concussion of the brain. This doctor further stated that the character of the injuries inflicted by the blows indicated that the appellant when he inflicted them was holding in his hand a rock or some other hard substance, and that they could not have been inflicted by a bare fist alone. Although the doctor was somewhat shaken in this statement on cross-examination, yet it was for the jury to say whether or not it believed what he said on direct examination. It did believe what he said on direct examination, for, under the instructions, it could not have found the appellant guilty as it did, unless it believed that he struck Hood Jones with a rock or some other blunt instrument. It is in this that this case is distinguishable from the Helmerking case and the Murphy case. In the Helmerking case it was shown that the death of the deceased was caused by his head coming in contact with a hard substance as he fell after being struck by the appellant with his bare fist. In the Murphy case, there was no evidence that the character of the injuries admitted to have been inflicted by the blow was such as that a rock or other blunt instrument must necessarily have been used in its infliction. In the Murphy

case there was no evidence that the blow struck by Murphy fractured the skull of Scales. It is true that after Scales was picked up from the ground, his skull was found to be fractured, but, in the light of all the evidence in that case, it was clear that the fracture was caused, not by the blow which Murphy struck, but by the head of Scales coming in contact with some hard substance when he fell to the ground. Here it is not only not denied, but it is also affirmatively established that the blows which appellant inflicted upon Hood Jones fractured the latter's jaws and caused the injuries from which he died. Those injuries, in the opinion of the physician, could not have been inflicted by a bare fist, alone, and must have been caused by the use of a rock or other blunt instrument. Thus we see that the distinction between the two cases is clear. Under the doctor's testimony, the commonwealth was entitled to have the case submitted to the jury. Nor can we say its verdict is flagrantly against the evidence on this score, for the jury, bringing to bear, as it had the right to do, its experience in every day affairs, could well believe the doctor's testimony that the injuries inflicted by appellant's blows could not have been caused by a bare fist—especially when appellant claimed no injury or even discomfort to his knuckles after hitting so hard a blow as to fracture a jaw. The dim light accounts for the story of those witnesses who could not tell whether appellant used a rock or other blunt instrument or not. It may also account for the story of those who thought the appellant struck Jones with his bare fist. The jury may also have disbelieved them. At all events, under all the circumstances of this case, we are convinced that the verdict is not flagrantly against the evidence.

It is next contended that the court erred in the instructions it gave. Appellant complains first of the instruction on murder, but, since he was not convicted under that instruction, he has no cause to question it, even if it be erroneous, a matter we do not decide.

The next instruction he complains of is the self-defense instruction. He says that the court in this instruction assumed that the appellant did strike the deceased with a deadly weapon. Appellant is in error about this. The court simply told the jury that, although they did believe beyond a reasonable doubt that the defendant killed the deceased with a deadly weapon, yet, if he acted in self-defense, the jury should acquit him. The court did not thus assume that the appellant had

killed Hood Jones with a deadly weapon. He was undertaking to tell the jury under what circumstances appellant had a right to kill Jones with a deadly weapon. Under the previous instructions the jury could not convict the appellant, unless it found he had killed the deceased with a deadly weapon. If they did not believe that, they had to acquit him. This self-defense instruction said, however, that, even if they did believe that appellant had killed Jones with a deadly weapon and so brought himself within those instructions which, if standing alone, would authorize his conviction, yet, if they further thought that the appellant acted in self-defense, as set out in that instruction, they should acquit him. This fully covered the appellant's substantial rights.

The next complaint is directed to the instruction No. 6, defining a deadly weapon as that term was used ''in these instructions.'' We have frequently written that all of the instructions must be read together. In order to convict the appellant under instruction No. 2, as the jury did, it had to believe that the appellant hit the deceased with some deadly weapon, and by instruction No. 6 the jury were told exactly what a deadly weapon was. The two instructions when read together were ample. It was not necessary for the court to tell the jury what did not amount to a deadly weapon, as under the language of this instruction the affirmative excluded the negative.

It is next contended that the court erred in failing and refusing to give an instruction on involuntary manslaughter. This contention of the appellant is based upon his theory that he killed the deceased with his fist. However, as stated, before the jury could convict the appellant of any offense under the instructions given by the court, they had to believe that the appellant used a deadly weapon. Unless they so believed, they had to acquit appellant. Guilt of the appellant was thus predicated upon the use of a deadly weapon. In York v. Commonwealth, 82 Ky. 360, we said: ''One must be presumed to intend the consequences of an act, reckless in its character of human life, and committed under circumstances calculated to endanger it. If death results, it cannot be properly said either that it was an involuntary homicide or a killing per infortunium.''

If the appellant hit Hood Jones with a deadly weapon, as the jury had to find that he did in order to convict him, then, under the facts and circumstances of this case, the death of Hood Jones cannot properly be

said to be involuntary homicide. See, also, Maulding v. Commonwealth, 172 Ky. 370, 189 S. W. 251. The trial court, then, did not err in refusing to give an instruction on involuntary manslaughter.

It is next contended that the court erred in the reception and rejection of testimony. First, it is contended that the court admitted incompetent evidence. We have carefully examined appellant's complaint in this regard, and find that in each instance referred to the court sustained appellant's objection to the evidence complained of. Appellant insists, however, that the court should have gone further and admonished the jury not to consider the question which was asked and, in some instances, the answer which was given before the objection was sustained. Even if appellant be correct as to the proper practice in such a state of case, we do not think he was prejudiced here, as the evidence complained of was trivial and had very little bearing on the real merits of the case.

The appellant says secondly that the court refused to receive competent evidence offered by him. This consists of evidence which the appellant sought to elicit from certain witnesses of his who had theretofore been on the stand. Their former testimony covered in all essential matters that which was sought to be elicited on the reexamination.

No error prejudicial to appellant's substantial rights appearing, the judgment is affirmed.