## Dotson v. Commonwealth.

Sept. 27, 1940.

J. S. Forester, Judge.

Rose & Rose for appellant.

Hubert Meredith, Attorney General, and Wm. F. Neill, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At his trial of an indictment by the Harlan County Grand Jury accusing him of murdering Lawrence La Fevers, the appellant, Ike Dotson, was convicted of voluntary manslaughter and punished by confinement in the State Reformatory for a period of ten years. His motion for a new trial was overruled, and on this appeal therefrom his counsel argue but one ground for a reversal, and which is that the court should have given the jury an instruction on involuntary manslaughter. Other alleged grounds are contained in the motion for a new trial, but they are abandoned in this court and sole reliance is made on the failure of the court to give the instruction referred to. An examination of the record fully justifies the abandonment of the other grounds contained in the motion for a new trial, since we find nothing in the record to sustain them. The opinion will therefore be directed exclusively to a consideration of the only ground relied on by counsel for a reversal of the judgment.

The affray or assault, during which the fatal blow administered to the deceased was given, occurred in a restaurant operated by one Collett in the town or village of Molus, in Harlan County, Kentucky, between 8:00 and 9:00 o'clock P. M., March 1, 1940. The building was about thirty or thirty-five feet long and twenty or twenty-five feet wide, and, besides the restaurant business conducted therein by Collett, he also dispensed both soft and hard drinks, and at the time of the difficulty here involved, and for sometime prior thereto on the fatal evening, the house was quite well filled with patrons of the place, some of whom engaged in dancing

by music furnished by a provided victrola—all of which furnished a complete setting for the eventual homicide that followed. The accused and his victim entered the building together some thirty minutes or more before the fatal difficulty, but whether or not they came to the village together is not disclosed. They stationed themselves after entering the building at different places in the room, and while defendant was sitting at a table—perhaps imbibing some kind of drink—the deceased approached it, or him, with a knife, but did not succeed in getting to him. When defendant discovered the approaching of deceased, he drew from his hip pocket his 38 special pistol and presented it on the deceased, who in the meantime had been taken in charge by a witness who testified in the case by the name of Chitwood, and the latter, with the assistance of others, started with him towards the door with the intention of putting him out of the house; but when they got to the door he refused to accept the suggested exit and remained in the building, but in the meantime he had closed his knife and put it in his pocket, followed by his leaning against a counter or showcase in the front end of the building in a more or less extreme state of intoxication.

At that juncture defendant started towards the place where deceased was standing with the intention, as he testified, of leaving the building from the front entrance near which the deceased was located surrounded by Chitwood and others forming a crowd which took up some portion of the space leading to the door; but there is nothing to show but that plenty of room existed for defendant to pass the crowd without molesting the deceased. Instead, however, he manifested, by his words and acts from the time he started towards deceased with his drawn pistol, very pronounced viciousness and went direct to his victim and struck him a vicious blow on the head with his pistol at the back of the ear near the base of the skull, but which did not, according to the proof, cut any gash or draw blood at the time. Shortly thereafter defendant and deceased left the building together and they were gone some ten minutes when they returned and intermingled with the crowd until they saw proper to depart for home. After the return of the two to the building the testimony discloses no further troublt but on the contrary apparent friendliness between the two.

Defendant testified that he had no intention of inflicting upon the deceased any harm when he left his seat in the rear of the building with his drawn pistol and started to the front door, nor did he intend to engage in any sort of affray in passing the point where deceased was standing; but that as he reached that point deceased drew his knife and, perhaps, made demonstrations to use it on defendant and to prevent him from doing so, and in the exercise of his right of self-defense, he struck deceased with his pistol and that he had no other intention except to defend himself by preventing deceased from using the knife on him and that he had no intention of producing death. However, some four or five or possibly more witnesses (and in fact every other witness who testified in the case except defendant) told a different story. They testified that defendant in arising from his seat and starting towards deceased while standing, as indicated, was not only angry, but exhibited determination for revenge by both action and speech, and went directly to the deceased and inflicted the blow upon his head with his pistol, although a number of persons endeavored by both words and acts to prevent him from doing so.

After arriving at home the deceased retired, but somewhere about 1:00 o'clock A. M. of the next morning he suffered hemorrhages from his ear and nose, which for the time being yielded to local baths administered by some member of the family and he temporarily recovered. However, sometime before 4:00 o'clock P. M. of that day, developments and symptoms were such as to force him in bed and he died about 4:00 o'clock that afternoon. Physician witnesses introduced in the case gave it as their opinion that the lower part of his skull was fractured from the blow of defendant's pistol against it, and which produced the later demise of the decedent. In fact, there is no contention that the blow administered by defendant did not produce decedent's death. On the contrary, the proof establishes without contradiction that the blow as administered by defendant, proximately produced the death of his victim. Chitwood in giving his version of what happened said that he threw up one of his arms to prevent or check the blow being administered by defendant, in the absence of which it possibly would have landed at a different place on the head of the deceased than where it did land, and which also may

have reduced to some extent the force of it that would otherwise have been employed.

Under the facts as so briefly but substantially stated, it is strongly urged that the court should have given the instruction contended for, and a number of cases are cited and relied on as sustaining that contention, chief among which is Maulding v. Commonwealth, 172 Ky. 370, 189 S. W. 251, and Cornett v. Commonwealth, 282 Ky. 322, 138 S. W. (2d) 492. The latter case involved a killing of the deceased on the highway by the driver of an automobile where the conduct necessary to convict one of voluntary manslaughter must be so reckless as to indicate a degree of carelessness necessary to produce voluntary manslaughter. The principles announced in that case we conclude have no bearing upon the facts of the instant one. The Maulding case was where it was assumed (as was testified to by appellant therein) that the only way and manner by which the wound inflicted thereby which produced the death of deceased was the use of the fists and feet of appellant in striking the deceased and knocking him to the ground and afterwards stomping him in the way and manner that produced his death. The contention was made in that case that an involuntary manslaughter instruction should have been given, but we determined otherwise, although no sort of instrument was used as a weapon for the infliction of the deadly blows administered to the victim. "No intent to kill" does not alone reduce the crime to involuntary manslaughter. It occurs "where a man is engaged in doing some unlawful act not amounting to a felony or likely to endanger human life, and has no intention to kill, but does kill another." Kearns v. Commonwealth, 243 Ky. 745, 49 S. W. (2d) 1009, 1010, and cases and authorities therein cited, including Roberson's Criminal Law, Section 394, and Commonwealth v. Owens, 198 Ky. 655, 249 S. W. 792.

The Kearns opinion in drawing the distinction between and marking the line separating voluntary from involuntary manslaughter is thus stated: "The distinctive feature of the offense [involuntary manslaughter] is just what the descriptive word means—done unwillingly and not from choice or with a will to do it. To justify an instruction on involuntary manslaughter, it should appear from all the acts and circumstances that the purpose to kill the person assaulted or struck or

wounded was lacking. Maulding v. Commonwealth, 172 Ky. 370, 189 S. W. 251. In the application of this law it generally finds no place where deadly weapons were brought into play; the most common exception being where there was an absence of gross recklessness in their use. But it is generally applicable where there was a fight without deadly weapons. Cf. Cheatham v. Commonwealth, 228 Ky. 765, 15 S. W. (2d) 525.''

It is true that under the facts of the Kearns case we concluded that the evidence authorized the involuntary manslaughter instruction, and which we are now convinced was correct, but the facts and circumstances disclosed by the proof in that case were and are far removed from those appearing in this one. Here the evidence, with but feeble if any contradiction, shows that appellant not only intended to inflict what turned out to be the deadly blow upon deceased, but he did so in the face of frantic efforts by others to prevent him from doing so and employed in the doing an instrument and weapon fully capable of producing death when used in that manner, and which, if death did not ensue, would be sufficient to convict defendant with maliciously wounding another with a deadly weapon. So that, if there had been no death following the assault then no doubt defendant would have been guilty of a felony by perpetrating the unlawful act and which, if true, would remove the case entirely from the domain occupied by involuntary manslaughter homicides, as will be seen by the inserted definition of that degree of the offense as taken from the Kearns opinion. Both sides cite other cases than those to which we have referred, but they are all of the same tenor and fortify what we have already said with reference to the distinction between voluntary and involuntary manslaughter. A case materially pertinent to the facts of this one, and which is cited by the commonwealth, is that of Conley v. Commonwealth, 225 Ky. 275, 276, 8 S. W. (2d) 415.

From the proof contained in the record—and which we have substantially outlined above—as viewed in the light of the law as declared in the cited cases, and others listed therein, we are convinced that this case furnishes no grounds for an involuntary manslaughter instruction, and the court did not err in failing to give it to the jury. The impression is inescapable from reading this record that at the time the deceased was struck by ap-

pellant with the latter's pistol he (deceased) was almost maudling drunk and was leaning against the counter or showcase of the occupant of the room with his knife in his pocket and not attempting to use it against appellant or anyone else. It also appears that, notwithstanding the subdued condition of the deceased, the appellant became very much enraged and formed a determination in his mind to take from deceased his knife at whatever cost and intentionally administered the fatal blow in his effort to accomplish that purpose. In that view of the case appellant is the object of congratulations over the outcome.

Wherefore, for the reasons stated, the judgment is affirmed.