(No. 5286. February 3, 1930.)

STATE, Respondent, v. CHARLES H. GEE, Appellant.

[284 Pac. 845.]

Delana & Delana, for Appellant.

W. D. Gillis, Attorney General, and Fred J. Babcock, Assistant Attorney General, for Respondent.

VARIAN, J.—Defendant was convicted of manslaughter and appeals. On the evening of March 9, 1928, Harry Tage and his wife, Laura Tage, were proceeding along the sidewalk at the north side of Hays Street, in Boise, to attend services at the Roman Catholic cathedral situate on the

west side of Eighth Street, between Hays and Fort Streets. A slight drizzling rain was falling which had followed a shower in the early afternoon, so that the pavements were wet. Mr. Tage, being somewhat deaf in the left ear, walked at his wife's left side, arm in arm with her. On account of the church services, cars of persons attending the same were parked on both sides of Eighth Street, in the block between Hays and Fort Street, which run easterly and westerly. Eighth Street crosses Hays at right angles, and runs northerly and southerly. Both Hays and Eighth Streets are forty feet wide from curb to curb, with twelve-foot parking and six-foot sidewalk between the curb and lot lines. Shortly after 7:30 o'clock P. M., defendant, while driving his Chevrolet coupe northward near the center of Eighth Street at a speed in excess of twenty-five miles an hour, struck both of the Tages while on the north pedestrian crossing on Hays Street, throwing the man, who weighed 210 pounds, up in the air and for a distance of fifteen feet from the north line of said pedestrian crossing, sideswiped a car parked on the east side of Eighth Street, and came to a stop about seventy feet from the north line of said pedestrian crossing. North of the north line of the pedestrian crossing across Eighth Street, the street-car tracks are divided into two lines, to enable cars going in opposite directions to pass. The divided tracks are twelve feet from the curb on each side of the street, and the inside rails are six feet two inches apart. Deceased was picked up in the forks of the switch leading to these double tracks. Mrs. Tage, who weighed 164 pounds, was afterwards removed, in an unconscious state, from under and between the axles of defendant's car. Tage was unconscious when picked up. Both were taken to a hospital, where Mr. Tage expired, never having regained consciousness, on Sunday, March 11th, at 11:55 A. M.

After Mr. and Mrs. Tage had been placed in separate automobiles for removal to the hospital, defendant got in his car, which though badly damaged was susceptible of being operated, drove north half a block, turned east on Fort

Street and proceeded two blocks to a point near Sixth Street, which terminates with its intersection with Fort. At this point, the northeasterly line of Fort Street is bounded by the United States military reservation. Defendant then drove his coupe upon the parking so that the rear wheels were in the street and the front wheels over the curbing. He placed the car at an angle to the street and directly in front of a tree, and there left it. Later, he appeared at the police station, and without mentioning the accident, told a circumstantial tale about having lost his car; that it had shortly before been stolen while parked in front of a store on Eighth Street. Later on, he admitted having left the car at the place above mentioned, and that he was driving it at the time of the accident.

There is ample testimony to the effect that, at the time of the accident, defendant was under the influence of intoxicating liquor, and was driving at an excessive rate of speed and without due care or circumspection. On May 21, 1928, at the trial, Mrs. Tage, who had been injured in the accident, had no recollection of the events immediately prior to being run down.

The first and most important assignment of error goes to the sufficiency of the information, appellant contending that since the offense charged was involuntary manslaughter, and the state was relying upon certain acts of negligence and certain violations of the laws and rules of the road, the information is not sufficient to sustain the conviction.

After stating that defendant is accused of the crime of manslaughter, it proceeds to charge as follows:

"That Charles H. Gee of Boise, Ada County, Idaho, on or about the 9th day of March, 1928, in Boise, County of Ada, State of Idaho, then and there being, did then and there wilfully, unlawfully and feloniously kill one Harry Tage, a human being.

"All of which is contrary to the form, force and effect of the statute in such case made and provided, and against the peace and dignity of the State of Idaho."

Appellant's demurrer to this information was overruled, as was his objection to the introduction of any testimony thereunder and a motion in arrest of judgment.

While recognizing the general rule that informations in this state couched in the language of the statute are held sufficient (*State v. Lundhigh,* 30 Ida. 365, 164 Pac. 690; *State v. George,* 44 Ida. 173, 258 Pac. 551; *State v. McMahon,* 37 Ida. 737, 219 Pac. 603; *State v. O'Neil,* 24 Ida. 582, 135 Pac. 60; *State v. Brill,* 21 Ida. 269, 121 Pac. 79; *State v. Ellington,* 4 Ida. 529, 43 Pac. 60; *People v. Butler,* 1 Ida. 231), appellant strenuously urges that where the state is prosecuting a charge of involuntary manslaughter, and relying upon violations of statute or commission of negligent acts, the information must set forth the manner and means of the commission of the homicide. He cites 30 C. J., p. 97, secs. 284, 285, *State v. Smith,* 25 Ida. 541, 138 Pac. 1107, and cases from Utah, Texas and Georgia to sustain this position.

Manslaughter, as defined by our statute, "is the unlawful killing of a human being, without malice. It is of two kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion.

"2. Involuntary—in the perpetration of or attempt to perpetrate any unlawful act, other than arson, rape, robbery, burglary, or mayhem; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Sess. Laws 1921, chap. 155, p. 348, amending C. S., sec. 8214.)

C. S., sec. 8823, provides:

"All the forms of pleading in criminal actions, and the rules by which the sufficiency of pleadings is to be determined, are those prescribed by this code."

C. S., sec. 8825, provides that an indictment must contain:

"1. The title of the action, specifying the name of the court to which the indictment is presented, and the names of the parties.

"2. A statement of the acts constituting the offense in ordinary and concise language, and in such manner as to

enable a person of common understanding to know what is intended.''

C. S., sec. 8826, prescribes the form of indictment:

''The state of Idaho against A. B., in the district court of the —— judicial district, in the county of ——. —— term, A. D. 19—.

''A. B. is accused by the grand jury of the county of —— by this indictment, of the crime of (giving its legal appellation, such as murder, arson, or the like), committed as follows:

''The said A. B., on the —— day of ——, A. D. 19—, at the county of —— (here set forth the act or omission charged as an offense).''

C. S., sec. 8827, reads:

''Certainty Required of Indictment. It' must be direct and certain as it regards:

''1. The party charged.

''2. The offense charged.

''3. The particular circumstances of the offense charged, when they are necessary to constitute a complete offense.''

C. S., sec. 8809, authorizes procedure by information, to which the code provisions as to indictments apply. (C. S., sec. 8812.) Offenses charged by information must be with the same fullness and precision in matters of substance as is required in indictments in like cases, the defendant having the same rights as to proceedings therein as he would have if prosecuted upon indictment. (C. S., sec. 8811.)

C. S., sec. 8834, provides that an indictment is sufficient when it can be understood therefrom:

''1. That it is entitled in a court having authority to receive it, though the name of the court be not stated.

''2. That it was found by a grand jury of the county in which the court was held.

''3. That the defendant is named, or, if his name cannot be discovered, that he is described by a fictitious name, with a statement that his true name is to the jury unknown.

''4. That the offense was committed at some place within the jurisdiction of the court, except where the act, though

done without the local jurisdiction of the county, is triable therein.

"5. That the offense was committed at some time prior to the time of finding the indictment.

"6. That the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended.

"7. That the act or omission charged as the offense is stated with such a degree of certainty as to enable the court to pronounce judgment upon conviction, according to the right of the case."

In construing C. S., secs. 8825, 8826, and 8827 (then Rev. Codes, secs. 7677, 7678, 7679), this court, in *State v. Smith,* 25 Ida. 541, 138 Pac. 1107, relied on by appellant; held in effect that an information charging "That the said defendant, Charles C. Smith, at the time and place aforesaid, did unlawfully and feloniously kill one Clara F. Foy, a human being; contrary to the form of the statute in such case made and provided," was insufficient to sustain a verdict of involuntary manslaughter where the evidence showed that death resulted from starvation by fasting prescribed by defendant. It will not be necessary to consider this case further than to observe that, as applied to manslaughter generally and in so far as it might be considered as an authority with reference to indictments or information for murder, it has been expressly overruled by this court. (*State v. Lundhigh,* 30 Ida. 365 (370), 164 Pac. 690; *State v. Boykin,* 40 Ida. 536, 234 Pac. 157.) The defendant was prosecuted for murder in each of the cases cited. In the Lundhigh case, the information charged:

"The said Alfred Lundhigh, on or about the 11th day of June, 1915, at the county of Bingham and state of Idaho, and prior to the filing of this information, did then and there wilfully, unlawfully, feloniously, and with malice aforethought, kill and murder one Evangelos Pappas, a human being."

Similar informations for murder were upheld in *State v. Boykin, supra; State v. Askew,* 32 Ida. 456, 184 Pac. 473; *State v. Arnold,* 39 Ida. 589, 229 Pac. 748.

C. S., sec. 8823, *supra,* being R. S., sec. 7675, was adopted for the purpose of abrogating the strictness of the common-law form of indictment. (*State v. Sly,* 11 Ida. 110, 80 Pac. 1125; *State v. Lundhigh, supra.*) And in *State v. Caviness,* 40 Ida. 500, 235 Pac. 890, this court sustained an information for murder that did not state that deceased died within a year and a day after receipt of the fatal blow.

It may be conceded that a majority of the courts in this country, under the same or similar statutes, sustain appellant's position. It is likewise apparent that the modern trend of judicial decision, evidenced by the opinions of this court above cited and the opinions of the highest tribunals of sister jurisdictions, is all toward a simpler, shorter form of indictment or information in criminal prosecutions. (See *People v. Pearne,* 118 Cal. 154, 50 Pac. 376; *People v. Bones,* 35 Cal. App. 429, 170 Pac. 166; *Reams v. State,* 24 Ga. App. 135, 100 S. E. 230; *Cambron v. State,* 36 Ga. App. 784, 138 S. E. 280.) This trend appears from legislative enactments as well. (Cal. Stats. 1929, chap. 159, p. 303; Iowa Laws 1929 (43 G. A.), chap. 266, pp. 303, 304; 2 Mass. Gen. Laws 1921, chap. 277, p. 2813; Mich. Public Acts 1927, pp 309, 310; 2 Page's Gen. Code of Ohio, sec. 13583; Wyo. C. S. 1920, sec. 7464.)

Mr. Chief Justice Callaway of the supreme court of Montana, in a well-reasoned opinion (*State v. Gondeiro,* 82 Mont. 530, 268 Pac. 507), sustains an information for manslaughter, under Mont. Rev. Codes 1921, sec. 10959, in a case where the facts were somewhat similar to those in the case at bar. The information charged that defendant "on or about the 14th day of August, A. D. 1927, at the county of Cascade, in the state of Montana, and before the filing of this information, did commit the crime of manslaughter, in this, that the said defendant did wilfully, unlawfully, and knowingly and feloniously kill one Mary Bykari, a human being, contrary to the form," etc.

In that case, the defendant killed a person riding in his car in colliding with a car going in the opposite direction.

Before our C. S., sec. 8214, was amended in 1921, *supra,* it was in the same language as Mont. Rev. Codes 1921, sec. 10959, defining manslaughter, both being identical with the California statute defining the same crime. Our present statute is substantially the same as the Montana section referred to, and Mont. Rev. Codes 1921, secs. 11841, 11842, 11843, 11844, 11845, 11852, and 11853, are practically identical with our C. S., secs. 8823, 8824, 8825, 8826, 8827, 8834 and 8835. The opinion in the Montana case is therefore of great persuasive force. (*State v. Gondeiro, supra.*)

If appellant had been simply charged with murder, and under proper evidence was convicted of manslaughter, the murder charge would sustain such conviction. (*State v. Phinney,* 13 Ida. 307, 12 Ann. Cas. 1079, 89 Pac. 634, 12 L. R. A., N. S., 935; C. S., sec. 8996; *People v. Tokoly,* 313 Ill. 177, 144 N. E. 808.) Upon a charge of voluntary manslaughter, a conviction of involuntary manslaughter, under statutes like ours, has been sustained. (*People v. Pearne, supra.*) And in any event, if defendant was not sufficiently informed by the terms of the information as to the charge he was required to meet, in a proper case he might demand a bill of particulars. While the right to do so is not recognized by our statutes, this court has held that a defendant would be entitled to such a bill in the sound discretion of the trial judge. (*State v. Rathbone,* 8 Ida. 161, 67 Pac 186.) As was said by Mr. Justice Sullivan in another case:

"If by reason of the defendant's long management of said bank and his participation in the making of many reports, he was not able to identify the particular report for which he was indicted, it was not ground for demurrer, but should have been reached by a demand for a bill of particulars." (*State v. O'Neil,* 24 Ida. 582 (594), 135 Pac. 60.)

The information substantially conforms to the requirements of C. S., sec. 8834, and other sections of the Penal

Code referred to herein, and it does not appear that appellant has been deprived of any substantial right (C. S., sec. 8835) by being required to plead thereto.

Appellant offered an instruction covering the statute law relative to right of way as between pedestrians and automobiles, and to the effect that the driver of a vehicle upon a highway within a business or residence district shall yield the right of way to a pedestrian crossing the highway at any pedestrian crossing within the prolongation of the lateral boundary lines of the adjacent sidewalk, except at intersections where traffic is regulated by officers or mechanical devices, and that every pedestrian crossing such highway within a business or residence district at any other point than a pedestrian cross-walk or intersection, shall yield the right of way to a vehicle upon the highway. (Sess. Laws 1927, chap. 260, sec. 18, p. 490.)

A young girl, aged seventeen years, was on the east sidewalk about thirty-five feet from the north line of the sidewalk, east and west, on the north side of Hays Street, at the time of the accident. She heard the impact, but did not see defendant's car when it struck the Tages, because of intervening cars parked along that side of Eighth Street, and was apparently greatly excited, if not hysterical, when she went to defendant, who approached from the street. After talking with him, she proceeded to her home on the northwest corner of the block (about 265 feet), and then returned to the scene of the accident. Later she noticed a "Ford coupe" parked across the north pedestrian crossing opposite the north sidewalk lines on Hays Street. Miss Wallace also testified that a car was parked in front of the sidewalk, as did W. R. McIntire; but these three witnesses testify to conditions after the accident. Where a fact or state of things is shown to exist at a particular time, there is no presumption that it was in existence prior thereto. (See 9 Ency. of Evidence, p. 916; 22 C. J., p. 92, sec. 30; *State v. Dexter*, 115 Iowa, 678, 87 N. W. 417; *Boyd v. Buick Automobile Co.*, 182 Iowa, 306, 165 N. W. 908; *Blank v. Township*

*of Livonia,* 79 Mich. 1, 44 N. W. 157; *MacRae v. Chelsea Fibre Mills,* 145 App. Div. 588, 130 N. Y. Supp. 339.)

On the other hand, the witness Knight, who was in a car coming south on Eighth Street, and about twenty-five or thirty feet north of the pedestrian crossing, saw the Tages and defendant's car before the impact, and stopped his own car opposite where Tage landed between the rails of the street railroad track. This witness testified that Tage was hit while crossing the north sidewalk, at about the middle of the street, and that there was no car across the pedestrian crossing at the time of the accident. The traffic officer who arrived promptly on the scene, testified that he parked his Chevrolet car across the crossing. Defendant told the police officers that he saw the man and woman "on the crossing." The evidence is uncontradicted that there was no car parked across the pedestrian crossing at the time of the accident, and it was not error to refuse this instruction.

■■ Error is assigned as to the failure of the court to give defendant's proposed instructions 13 and 14, which are predicated upon the assumption that the evidence showed that deceased came suddenly upon the street from between two parked automobiles, and attempted to cross without looking for approaching motor vehicles. There is no sufficient evidence upon which to base such a theory. In general, contributory negligence is not a defense in a criminal prosecution. (*Maxon v. State,* 177 Wis. 379, 21 A. L. R. 1484, 187 N. W. 753; *Keller v. State,* 155 Tenn. 633, 59 A. L. R. 685, 299 S. W. 803; *People v. Rewland,* 335 Ill. 432, 167 N. E. 10; *State v. Campbell,* 82 Conn. 671, 135 Am. St. 293, 18 Ann. Cas. 236, 74 Atl. 927.)

■ Defendant's proposed instruction in the language of the act, that no car shall be parked within twenty-five feet from the intersection of curb lines, etc., at an intersection of highways (Sess. Laws 1927, chap. 260, sec. 25, p. 493), was properly refused. It is true that a witness testified that she had parked her car two feet from the north sidewalk line, which brought the car within twenty, not

twenty-five, feet of the curb intersection. How this fact could have any bearing upon the case is hard to understand. The evidence shows that these people were struck down on the street crossing, and how the fact that some other person violated a parking statute by leaving a car five feet nearer the crossing than the law permits, can excuse defendant, is inconceivable. Even if defendant was going at a lawful rate of speed and had the right of way and the right to assume that the cars were lawfully parked at the crossing, those facts will not excuse him from responsibility in wantonly or carelessly exercising his rights in the premises.

The court refused defendant's requested instruction to the effect that if the jury found that defendant was lawfully proceeding along the street at the time he first observed deceased, "and that the position of the deceased was one of sudden emergency, . . . . the law does not hold the defendant to the same responsibility for sound judgment and proper action as under other circumstances. The fact that the driver had to act suddenly in an emergency, and without opportunity for deliberation, is a circumstance to be taken into consideration in determining what is ordinary care in that situation."

Appellant argues that he was entitled to this instruction upon the theory that deceased came out from behind parked cars suddenly. There is no direct evidence that deceased came out from behind parked cars, and, as stated, the evidence is to the contrary. Defendant testified that when he struck deceased, defendant's car was just passing, or had passed, the first car parked on his right. Adopting, for the sake of argument, defendant's theory that a car was parked across the pedestrian crossing, it was the "first car on his right" going northward, and admittedly deceased was struck right at said crossing. If we assume that the first car parked on the right was two feet from the north line of the north pedestrian crossing, then defendant says that Mr. Tage was hit within about fourteen feet or less north of the said north line, allowing twelve feet as the length of the car.

The undisputed physical facts refute the theory that the Tages were struck anywhere but on the pedestrian crossing, near the center of Eighth Street. It is uncontradicted that Mr. Tage, immediately after the accident, was found fifteen feet north of that crossing. Gee testified that he was driving at twenty miles per hour when the accident happened. The combined weight of Mr. and Mrs. Tage was 374 pounds. The left side of defendant's car was damaged; the radiator bent back on that side six or seven inches; the rod connecting the headlights was bent; the left front fender and headlight were badly mashed; the body caved and mashed in on the left side where the cowl light had been, and blood showed thereon, from which it appears that Mr. Tage's body came down on the car and necessarily must have been thrown forward in the direction the car was going. Now, the car was moving northward at a speed of at least twenty miles per hour. Can it be inferred that his body was struck twenty feet from the north line of the pedestrian crossing, and hurled backward five feet or that he was struck fourteen or fifteen feet from the line and merely knocked down, when it is undisputed that he was hurled into the air? True, defendant says he did not see him in the air, or see him hit the left cowl lamp; neither does he explain what happened, whether Tage was merely knocked down, or thrown upon the car and carried along for a short distance. He only says that when he first saw Mr. Tage he was in the center of and in front of defendant's car. Miss McIntire did not see the defendant's car strike Mr. Tage; a parked car prevented her clearly seeing all that happened; she saw a hat fly in the air. Knight's testimony to the effect that Mr. Tage was thrown in the air, is not contradicted.

There was ample evidence that defendant was driving at reckless and excessive speed in leaving the street intersection and approaching the north pedestrian crossing; that he was looking to his right, and not ahead. He had reason to expect to meet pedestrians on the crossing. He stated that the lights blinded him, referring to the lights of an automo-

bile following the street bus which passed him southbound just before he arrived at the street intersection, but that he could see to the right. He admitted to police officers that before the accident he saw the Tages standing as though waiting for the bus. Notwithstanding the lights blinded him on looking ahead, he accelerated his speed after leaving the center of the street intersection. Defendant was not, under all the facts in the case, entitled to this instruction. Again, taking the testimony of Miss McIntire, in the light of the unquestioned fact that the defendant's car stopped from seventy to eighty feet north of the said north pedestrian crossing, and measuring the distances given by her with reference to the location of defendant's car after being brought to a stop, said testimony wholly fails to sustain defendant's theory that Mr. Tage was hit north of the pedestrian crossing.

Appellant contends that by the court's instructions, it was assumed that proof of a violation of the road laws was sufficient to convict, regardless of whether such violation had any connection with or caused decedent's death. This contention cannot be sustained. The court, substantially in the language of the statutes, instructed the jury to the effect that driving any vehicle upon any highway within this state, while under the influence of intoxicating liquor, is unlawful; that any person driving a vehicle on a highway shall drive the same at a careful and prudent speed, not greater than is reasonable and proper, having due regard to the traffic, surface and width of the highway, and of any other conditions then existing, and no person shall drive any vehicle upon a highway at such speed as to endanger the life, limb or property of any person; that, with certain mentioned exceptions, it shall be *prima facie* lawful to drive at a speed not exceeding twenty miles an hour in a residence district, and stated the law with regard to driving in business districts and elsewhere; that it is *prima facie* unlawful to exceed any of the rates of speed mentioned therein. The court then defined "*prima facie* lawful" and "*prima facie* unlawful" and also "business"

and "residence" districts. The following instructions were likewise given:

"You are further instructed that it is unlawful for any person to drive any vehicle upon a highway in this state carelessly and heedlessly in wilful or wanton disregard of the rights or safety of others, or without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property.

"You are further instructed that if any person drives a vehicle upon any highway in this state unlawfully, as in these instructions referred to and defined, and in so doing drives such vehicle against the body of any person and by reason of so driving said vehicle causes the death of that other person, such killing constitutes manslaughter."

The last instruction told the jury that if one, while unlawfully driving any vehicle upon a highway, runs into and kills any person by reason of his unlawful driving of the vehicle (as unlawful driving is referred to and defined in the instructions), the killing is manslaughter; that is, in effect, that the proximate cause of the killing must have been the unlawful driving.

It is likewise urged that the question as to whether deceased's own acts caused his death was eliminated by the court's failure to instruct on that point. The answer is that there was no evidence that deceased came suddenly into the street, at any place, or that he was anywhere but upon the crossing when struck, or that his own act caused his death. The court was justified, under the evidence, in refusing to give instructions based on that theory.

The state's witness Curtis testified on direct examination to going with defendant and four other persons in defendant's car to South Boise, where a gallon jug containing moonshine whisky was procured and taken to the bench on the Mountain Home road. After drinking there, the jug was taken to defendant's rooms in Boise, where more drinking was indulged in. Later, defendant returned from taking a young lady to her place of employment, and the same five men, including defendant and the witness, were to-

gether. The witness testified on cross-examination that, at the time just related, all drank except the defendant; that he did not see him take a drink, either then or on the Mountain Home road. The witness was not asked on direct examination if defendant drank on any of these occasions. The prosecuting attorney was sworn and interrogated in the absence of the jury. He testified that defendant told him before the preliminary examination and immediately thereafter that defendant did take a drink of moonshine when the five men were together in defendant's rooms, shortly before the homicide; that shortly before the present trial, the witness told the prosecuting attorney, at his office, of the trip to South Boise and return with defendant and companions on the day of the homicide, and that he would testify that he did not see defendant take a drink on the Mountain Home road. The prosecuting attorney did not ask about drinking on the later occasion in defendant's rooms, but dismissed him. At the preliminary examination, this witness, when asked if the defendant drank any liquor at his rooms, at the time in question, answered, "I couldn't say," and "I don't know." The jury was recalled, and over objection, after laying the proper foundation, the prosecuting attorney was permitted to prove by the committing magistrate that after the preliminary examination the witness stated that he saw defendant take a drink at his rooms at the time mentioned.

Defendant contends that it was error to permit the state to impeach its own witness in the absence of a sufficient showing of being taken by surprise by the witness' testimony. C. S., sec. 8036, provides for the impeachment of a party's own witness:

"The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made, at other times, statements inconsistent with his present testimony."

In *State v. Corcoran,* 7 Ida. 220, 61 Pac. 1034, the state was allowed to impeach a witness by showing that his testi-

mony at a coroner's inquest was inconsistent with his testimony at the trial, saying:

"The evidence given by the witness at the trial was inconsistent with that given by him before the coroner's inquest, and the evidence set forth above was, for that reason, under the provisions of section 6080 of the Revised Statutes, admissible." (7 Ida., p. 238, 61 Pac. 1040.)

R. S., sec. 6080, is identical with C. S., sec. 8036, *supra.*

"It should be borne in mind, however, that a party producing a witness 'may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony.' (Rev. Stats., sec. 6080.) Such was the holding of this court in *State v. Corcoran,* 7 Ida. 220, 61 Pac. 1034." (*State v. Fowler,* 13 Ida. 317, (322), 89 Pac. 757. See, also, *State v. Hite,* 24 N. M. 23, 172 Pac. 419.)

Even conceding that one of the qualifications of the rule laid down by this statute may be that the evidence given by the witness "surprised" the prosecutor, the record here is sufficient to bring the case within the qualification of the rule. The witness was unfriendly, and had made two statements to the prosecuting attorney that defendant did drink on the occasion under consideration, the last statement just after he had testified at the preliminary examination that "he didn't know." Again, the particular testimony impeached was elicited on cross-examination by defendant's counsel. (*People v. Smith,* 113 App. Div. 396, 99 N. Y. Supp. 118.) On his direct examination, defendant admitted taking a drink at the time and place mentioned, and therefore was not prejudiced by the impeachment of that portion of Curtis' testimony.

The chief of police of Boise testified that, at the time of the accident, Eighth Street was not posted as a through street. Thereafter, a policeman witness for the state testified over objection that he posted the signs on Eighth Street eight days after the accident. A minute entry of the city council of the meeting of February 21st, to the effect that the chief of police was authorized to issue

a traffic promulgation making Eighth Street a through street between Bannock and Ridenbaugh Streets, was excluded by the court. The defendant was not permitted to cross-examine as to when the promulgation had been initiated. The ordinance authorizing the promulgation by the chief of police of traffic rules establishing a through street, provides that the promulgation shall not be operative unless a copy shall have been first filed with the city clerk, approved by the city council at a regular or special session, and suitable signs or standards or guides, stating the substance of the rule, are placed upon the highway or the part thereof affected. We fail to see how the rulings complained of affected defendant's rights, and in any event the promulgation was not operative at the time of the accident, the street not having been posted. There was no substantial error.

Appellant asserts that the court erred in sustaining objections to certain questions asked by him. Two of the questions called for conversations between the defendant and third persons, and by the other the defendant was asked why he had no intention of returning to Evans and Montgomery, whom he had left at the corner of Fourteenth and Washington Streets. On the face of the record, the first two were clearly hearsay and the last irrelevant. Counsel made no offer of proof, and it is impossible to see from the questions themselves in what particular the court erred.

On cross-examination of the traffic officer Hedrick, who had previously testified that he had parked his Chevrolet car across the east pedestrian crossing on the north side of Hays Street on arriving at the scene of the accident shortly after its occurrence, he was asked if he had talked to anyone of parking his car. He answered "Yes." When asked "When?" objection was made and sustained. Further on he testified that he discussed no particular car that was parked, but the parking of cars generally, his included. In the light of all the testimony, the court did not err.

At the trial, the state laid the foundation for impeaching one of defendant's witnesses as to certain testimony

given by her on direct examination. It appears that when interviewed by the prosecuting attorney prior to the preliminary examination, the questions propounded to the witness and her answers returned thereto were, in the presence of the prosecuting attorney and his deputy, taken down in shorthand by a stenographer, and later transcribed into longhand by him. The prosecuting attorney read certain questions and answers thereto to the witness, and asked if they were so asked and answered, at his office, in the presence of the persons named, on a certain date. Defendant's counsel demanded the transcript of said notes, and that the same be exhibited to the witness before she be required to answer. The demands were refused, and the court declined to order the prosecuting attorney to comply therewith. Appellant urges this ruling of the court as error, contending that the witness was entitled to see the transcript before answering, under the provisions of C. S., sec. 8039 (identical with Cal. Code Civ. Proc., sec. 2052), which reads as follows:

"A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements must be related to him, with the circumstances of times, places and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them."

The witness denied making the answers stated, and in rebuttal, over objection, the state was permitted to prove them by the oral testimony of the stenographer.

The notes taken by the stenographer, and the longhand transcription thereof, were in the nature of unsigned memoranda of voluntary statements made by the witness not under oath. The transcript had no evidentiary value in the absence of any showing that the witness had signed or otherwise adopted it, or, having read it, admitted its correctness. It constituted no part of any regular, recognized procedure in the case, and could not itself be offered to impeach the

witness. (*People v. Glaze*, 139 Cal. 154, 72 Pac. 965; *State v. Brake*, 99 Or. 310, 195 Pac. 583; *State v. Yee Guck*, 99 Or. 231, 195 Pac. 363.) It was not error to refuse to require the prosecuting attorney to exhibit the transcript to the witness before she answered (*People v. Talman*, 26 Cal. App. 348, 146 Pac. 1063), or to deliver the same to defendant's counsel to assist him in his examination of the witness. (*People v. Glaze, supra; People v. Fuski*, 49 Cal. App. 4, 192 Pac. 552; *People v. Casey*, 79 Cal. App. 295, 249 Pac. 525.)

 It is finally urged that the court erred in sustaining the state's objection to the following question propounded to its witness Knight on cross-examination, upon the ground that it was too indefinite and vague:

"If you couldn't see the sidewalk on either side of the street, how do you arrive at the conclusion that they (Tage and wife) were on the sidewalk?"

When all the facts of the location are considered, that the witness was approaching in a car only thirty-five feet away when the Tages were hit, that the street intersection was within fifty-three feet, and all the facts brought out by this witness' cross-examination, we feel that defendant suffered no prejudice by the ruling, and that the objection was properly sustained.

 The evidence is not only ample to sustain the charge that defendant, at the time of the accident, was under the influence of intoxicating liquor, but that he was driving his car recklessly, at a rate of speed far in excess of what would constitute due care and circumspection in view of the condition of the street and general visibility at the time. His admission that he saw the Tages "on the crossing" before he reached the street intersection; his testimony that he "stepped on the gas" while in the street intersection on approaching the fateful crossing, and looked to his right without slackening his speed; his statement that he was "blinded by the lights"; the fact that his speed was such that a man weighing 210 pounds was hurled into the air by the force of the impact, and was deposited fifteen feet

from the place where struck; that a woman weighing 164 pounds, after being knocked down was dragged seventy feet before the car was stopped, notwithstanding the brakes on defendant's car were shown to have been in good working order,—all point to wanton carelessness amounting to criminal negligence in defendant's operation of the car.

Judgment affirmed.

Givens, C. J., and Budge and Lee, JJ., concur.

Petition for rehearing denied.