TERRITORY OF HAWAII *v.* PHILOMINO ALCOSIBA.

No. 2466.

ARGUED JULY 14, 15, 1942.    DECIDED NOVEMBER 18, 1942.

KEMP, C. J., PETERS AND LE BARON, JJ.

232

OPINION OF THE COURT BY LE BARON, J.

Upon an indictment charging him with the murder of one Conception Mandrial, a verdict of guilty of the crime of murder in the first degree was entered against Philomino Alcosiba, the defendant. The trial judge set aside this verdict and granted a new trial on the motion of counsel for the defendant. After a second trial the defendant was convicted of murder in the first degree and was sentenced to be hanged. An appeal has been perfected, specifying nineteen assignments of error, relating to the second trial.

Section 3563, Revised Laws of Hawaii 1935, impels this court to review the evidence to determine if the interests of justice require a new trial whenever a sentence of death has been imposed and such a review has been made.

There was little conflict in the record and the evidence was amply sufficient to justify the jury in finding the following facts, most of which were undisputed by the defendant, and we must therefore assume that the jury by its verdict of murder in the first degree did so find.

Conception Mandrial at the time of her death on May 30, 1939, was a Filipino high school girl, sixteen years of age, and a virgin. The defendant is a Filipino laborer who lived in the home of Conception Mandrial and shared the household expenses. During that time he was twenty-six

years old and had been twice divorced. While there, he became infatuated with her and desired to marry her. As a result an understanding was entered into about two months before her death between the parents and the defendant to the effect that the defendant could marry their daughter if he would wait for three years to do so. However, when the defendant complained that the daughter appeared indifferent to him, the father called the girl, had her clasp hands with the defendant and cautioned her not to be unfriendly. Nevertheless, the girl continued to ignore the defendant. This he keenly resented as a violation of his understanding of the marriage agreement. Further, he suspected that she preferred another. According to his subsequent statements and confessions, the defendant, about two weeks before May 24, 1939, had decided to seek an occasion wherein he could determine from her whether she in fact was in love with another and if so then to kill her with his pocketknife. On May 24, 1939, the defendant did not go to work, complaining of a pain in the stomach. At the close of school he waited for Conception Mandrial and intercepted her on her way home, at about 2 : 45 in the afternoon. After a brief conversation the girl told him that she was in love with another. He then reached for his knife. She became frightened, pushed him from her, and ran a short distance away. He chased her, knocked her down and pinned her to the ground. She was defenseless. While she struggled, the defendant plunged the four-inch, sharp and pointed blade of his pocketknife into her chest, inflicting a seven-inch cut that extended diagonally across her chest from right to left, completely opening it down to the lungs, severing three ribs and indenting the pericardium, or covering, of her heart, twice slashed her abdomen, severing the mesenteric artery and puncturing the large intestine, and also twice lacerated her left arm cutting deeply into the muscles.

The defendant stated less than two hours later that when he went to meet Conception Mandrial he had an intention to kill her, that when he stabbed her he meant to kill her, and that after he had finished the stabbing he looked around for a policeman but saw none. Less than an hour after the attack the defendant said: "I kill her so she no can go with somebody else. * * * Long time I made up my mind; it is her fault. *· * * They can hang me for this; I don't care." Leaving the body of the girl the defendant walked briskly to a nearby streetcar, which was stopped at the time, facing toward downtown Honolulu in the direction of the police station. The defendant jumped into the streetcar and immediately asked to be taken to the police station and stated that he had just stabbed his girl friend because she had double-crossed him. Before the defendant had ridden very far he was arrested by a motorcycle policeman and taken to the police station. In his pocket was found the pocketknife, freshly stained with blood. His hands and clothes were covered with fresh blood. From the police station he was taken to the Queen's Hospital to see his victim, who was then on the operating table. There she and the defendant mutually identified each other. In her presence, when the defendant was asked as to why he stabbed her, he replied, "Because she double-crossed me." Before leaving the grounds of the hospital the defendant confessed to a police officer to all the material details of the attack. Later that evening he made another detailed confession and when informed that the girl was doing as well as could be expected, he said, "Oh, more better she make [die]." The next morning, the confessions having been transcribed, the defendant read them, stated that they were true, and signed them. Without going into the substance of the confessions, it is sufficient to say that they contain a coherent, rational and complete account of the knifing of Conception Mandrial

by the defendant and his motive for doing it. On May 30, 1939, she died as a direct and proximate result of the knife wounds inflicted upon her by the defendant, which counsel for the defendant admitted in the presence of the jury.

The foregoing recital of facts, which a jury would have been fully justified in finding from the evidence, demonstrates that there was ample evidence to justify the jury's verdict and that therefore the interests of justice do not require a new trial, unless there was error committed at the trial prejudicial to the defendant.

In respect to the two confessions, counsel for the defendant contends that they were not admissible in evidence. His grounds are that the confessions were not voluntary nor accurately recorded and that the defendant was not warned that they would be used against him. His contention is without merit. The evidence was overwhelming before the trial judge that there were no threats made nor promises of immunity extended and that the defendant, without fear or promise of favor, in the same free spirit as were his admissions to the streetcar conductor a few minutes after the attack, as well as his testimony in respect thereto upon the witness stand, voluntarily made his statements, read them over when they had been reduced to writing, stated that they were true, and signed them. The testimony of the police officers to whom the statements were made, the officer who transcribed them, and the alleged statement made by the defendant at the time of signing, show conclusively that the confessions were accurately recorded. Being clearly voluntary and correctly recorded, they were properly admitted into evidence. Any reasonable doubt in respect thereto was for the jury to resolve in the defendant's favor under the lower court's instructions. It is true that the defendant was not warned that his statements would be used against him but such warning is not necessary under the provisions of

236

section 3834, Revised Laws of Hawaii 1935. It was so decided by this court (*Ter.* v. *Fukunaga,* 30 Haw. 697, 729, 730) : "The contention is * * * that the defendant was not warned prior to making his confession that it would or might be used against him in court and that he should have been so warned. Our statute does not so require. It merely requires that it shall first be made to appear that the confession was in fact voluntarily made. A confession may well be voluntary, irrespective of whether the warning contended for was or was not given beforehand. It was not error to admit the confession without prior warning having been given to the defendant."

Counsel objects to the trial court's action in allowing the prosecution to re-cross-examine the defendant upon matters relating to the alleged defense of temporary insanity. "Under the law the latitude allowed to counsel in the examination of witnesses is left largely to the discretion of the trial court, and the appellate court is not inclined to reverse a judgment on this ground unless the discretion has been clearly abused." *Merricourt* v. *Norwalk Fire Ins. Co.,* 13 Haw. 218, 220. (See also *Booth* v. *Beckley,* 11 Haw. 518, 521; *Flint* v. *Flint,* 15 Haw. 313, 315; *Territory* v. *Good,* 27 Haw. 8, 15.) From the record it is apparent that the action of the trial court was entirely proper and a due exercise of its discretion.

Further, this examination clearly laid the foundation for the purpose of impeachment by the former testimony of the defendant in the first trial, which the defendant did not admit and failed to deny or remember in the second trial. A proper foundation of the time, place and circumstance having been laid within the meaning and purview of section 3832, Revised Laws of Hawaii 1935, proof of the prior statements was made by the official shorthand reporter. Counsel objected on the grounds that the stenographic notes were not authenticated nor shown to the

defendant witness. However, it is clear that counsel's objection is without merit. The notes were not admitted in evidence; it was merely the testimony of the witness which was adduced. Hence, the statutory requirements of section 3833, Revised Laws of Hawaii 1935, are inapplicable. (See *People* v. *Talman,* 26 Cal. App. 348, 146 Pac. 1063, 1064; *State* v. *Gee,* 48 Idaho 688, 284 Pac. 845, 853.)

The sole defense offered by the defendant to the charge of murder was that of temporary insanity. Consistent therewith, the defendant made no attempt to deny that he was the one who had knifed Conception Mandrial.

Section 5323, Revised Laws of Hawaii 1935, provides that "Any person acting under mental derangement, rendering him incompetent to discern the nature and criminality of an act done by him, shall not be subject to punishment therefor * * *." This provision refers to the condition of the mind at the time of the commission of the act or acts charged.

The only evidence dealing with the time of the commission of the acts charged and argued by counsel for the defendant as compatible with the defense of mental derangement is found in the testimony of the defendant. The defendant testified that after the girl informed him she loved another she pushed him. Then he testified: "My head noise, crazy like that. After that I don't remember what I do to her. I think I stab her. I do not know. * * * My head noise and crazy like. From that I don't know what I going to do." Then his counsel asked this question: "When is the next time you remember what you did?" The defendant answered: "When I catch streetcar * * * behind the Hawaiian church." On cross-examination the defendant testified to the same incident as follows: "Then all I heard is the noise in my

ears and my head and I don't remember any more after that."

Counsel argues that this subjective testimony tends to show that the defendant at the time he stabbed Conception Mandrial was temporarily insane, which he labels as a mental "blackout," caused by an emotional explosion.

Mental derangement, as indicated by the term itself, denotes a disordered or unsound mind. It is interchangeable in meaning with the word "insanity." Many authorities have referred to insanity as a disease of the mind. However, it is now generally conceded that insanity or mental derangement is rather the result or manifestation in the mind of a disease of the brain, and by disease is meant any underdevelopment, pathological condition, lesion or malfunctioning of the brain or any morbid change or deterioration in the organic functions or structure thereof. In *Francke* v. *His Wife,* 29 La. Ann. 303, 304, the following definition of mental derangement is found: "An authority on this subject (Ray, quoted by Wharton & Stille, Medical Jurisp., 1 vol., section 314,) arranges the diseases included in the general term mental derangement under two divisions, founded on two very different conditions of the brain; the first being a want of its ordinary development, the second a lesion of its structure subsequent to its development, in the former of which divisions he places idiocy and imbecility, differing only in degree."

Mental derangement and insanity are generic terms for all disordered, unsound or abnormal conditions of the mind and take many forms, thereby preventing satisfactory, rigid or narrow definitions. However, we need not concern ourselves with the various kinds of mental derangement necessary to exculpate criminal responsibility. The statutory defense does not deal with types or degrees of mental derangement but only with its effect on a person at the time of the commission of a criminal act. In con-

struing the statute, for the purposes of this case it is sufficient to say that in order to constitute a defense, the mental derangement under which the defendant acted at the time of the commission of the alleged offense must be caused by or be the effect of a disease of the brain rendering him incompetent to discern the nature and criminality of the act done by him. (See *M'Naghten's Case,* 8 Eng. Reprint 718 (H. L. 1843); *Golden* v. *Commonwealth,* 275 Ky. 208, 216, 217, 121 S. W. [2d] 21, 25; *Garner* v. *State,* 112 Miss. 317, 73 So. 50, 51; *State* v. *Cook,* 69 W. Va. 717, 72 S. E. 1025, 1027; *State* v. *Butchek,* 121 Ore. 141, 253 Pac. 367.)

In order to justify the submission of the defense of mental derangement to the jury, there must therefore be some evidence showing or tending to show mental derangement caused by or the effect of a disease of the brain.

No such evidence was produced. There was not the slightest attempt to prove an impairment of the brain nor an abnormal condition of the mind nor any manifestation thereof.

The record contains no evidence tending to show that the defendant was ever childish, incoherent or irrational in his speech, ever unnatural or abnormal in his actions, ever queer or abnormal in his appearance, or ever had fits, trances, delusions or hallucinations, or ever betrayed a confusion of mind as to time, place or person, or ever displayed any other manifestations of a disordered mind. Further, there was no evidence of such manifestations in any of his forebears. The single incident of a transient loss of memory occurring at the time of the criminal act, as recounted by the defendant, is not of itself symptomatic in the slightest degree of an abnormal condition of the mind so as to have warranted the submission of the defense of insanity to the jury. The medical expert introduced by the defense did not observe the defendant nor

was he given any case history of the defendant or asked any hypothetical questions based upon the evidence of the case. His testimony was in the abstract and not connected with the defendant. The evidence is therefore conclusive that the defendant was entirely sane immediately before and after the homicide. Hence, unless indicated by the subjective testimony of the defendant, there was no proof in the record of mental derangement.

Emotional insanity without more does not constitute mental derangement as that term is used in section 5323, *supra*. Emotions are merely states of feeling common to all mankind. In regard to their effect when aroused they are the antithesis of unconsciousness and indicate an awareness of the inward state of the mind as well as an alertness to outward facts. They generally accentuate the perceptions of the mind and hence tend to pave the way for the formation of a criminal intent. Emotional disturbances therefore readily become concomitants of the vast majority of crimes of violence. For instance, in *Collins* v. *State of Florida,* 88 Fla. 578, 584, 102 So. 880, 882, the emotion of anger was held to be a "motive which sometimes impels one to murder another, and because it is overwhelming in its force and sweeps prudence and consideration aside, it is none the less a motive, and is in no degree an excuse that will relieve the affected one from responsibility for criminal homicide, and such state cannot be said to be that of an insane person." (Cited with approval in *Chesser* v. *State,* 92 Fla. 589, 109 So. 599.)

The attitude of the courts in respect to emotional insanity is expressed in the case of *Graves* v. *State,* 45 N. J. L. (16 Vroom) 347, 350, 46 Am. Rep. 778, as follows: "Many of the forms and degrees of mental disease which, in the judgment of learned men, would be regarded as insanity, are utterly rejected by the law in the administration of penal justice. The law regards insanity as a

disease of the mind, implying fixedness and continuance of mental condition. It therefore rejects the doctrine of what is called emotional insanity, which begins on the eve of the criminal act and ends when it is consummated. * * * 'Insanity is only a manifestation of disease of the brain. The doctrine that an individual can be entirely sane immediately before and after any particular act, and yet insane at the instant the act was committed, is contrary to every principle of sound psychological science.' "

In other jurisdictions where insanity, to constitute a defense, similarly as under our statute, must be the result or effect of a disease of the brain, emotional insanity unassociated with the brain or mental disease is not considered a defense. (*People* v. *Kernaghan,* 72 Cal. 609, 14 Pac. 566; *Howard* v. *Commonwealth,* 224 Ky. 224, 5 S. W. [2d] 1056; *State* v. *Moore,* 42 N. M. 135, 76 P. [2d] 19, 33; *State* v. *Morris,* 263 Mo. 339, 172 S. W. 603, 606; *State* v. *Aeschbach,* 107 N. J. L. 433, 153 Atl. 505, 507; *Kilpatrick* v. *State,* 213 Ala. 358, 104 So. 656, 661; *Watson* v. *State,* 177 Ark. 708, 7 S. W. [2d] 980, 59 A. L. R. 356; *Garner* v. *State, State* v. *Cook, Golden* v. *Commonwealth, State* v. *Butchek, Graves* v. *State, Collins* v. *State, Chesser* v. *State,* all *supra.*) In other words, where one does not act under the duress of a diseased brain, but from motives of anger, revenge, or other passion, he cannot claim to be shielded from punishment for crime on the ground of insanity. Although a mental derangement often coexists with a disturbance of the emotions, affections or other moral powers, nevertheless it must be distinguished from an overwhelming emotion not growing out of and connected with a disease of the brain. And the reason such is not a defense is that its presence does not prevent the forming of a criminal intent nor render the defendant incompetent to discern the nature and criminality of his act.

Consequently, in the light of the authorities, together with the plain and unambiguous language of our statute, it is clear that the subjective testimony of the defendant in respect to an emotional disturbance at the time of the criminal act, unassociated as it was with any evidence showing or tending to show a disease of the brain, was not evidence tending to establish the presence of a mental derangement which would exculpate the defendant for his criminal act. It would not have been therefore an error for the lower court to have refused to submit the question to the jury. (*Swann* v. *The State*, 92 Tex. Cr. 153, 242 S. W. 735; *Howard* v. *Commonwealth, supra*; *State* v. *Jackson*, 142 S. W. [2d] 45 (Mo. 1940) ; see *State* v. *Melvin*, 219 N. C. 538, 14 S. E. [2d] 528, where it was held not error to instruct that there was no evidence of insanity; *Thompson* v. *State*, 119 Tex. Cr. 486, 44 S. W. [2d] 990; *Pitts* v. *Commonwealth*, 227 Ky. 792, 13 S. W. [2d] 1053; *Smiley* v. *Commonwealth*, 235 Ky. 735, 32 S. W. [2d] 51.) But the trial judge did submit the question to the jury, and while it was not necessary for him to do so, it was not prejudicial but was done for the benefit of the defendant. The defendant was given an avenue of escape to which he was not entitled and it therefore logically follows that he cannot now be heard to complain.

Although insanity is a defense and not a mitigating circumstance (*Warner* v. *State*, 114 Ind. 137, 16 N. E. 189), the subjective testimony of the defendant, to the extent that it may be relative to provocation immediately preceding the stabbing, was properly submitted to the jury under instructions of the lower court upon the question of whether there was deliberate premeditated malice aforethought.

The final group of assignments relates to the question of whether the defendant was afforded a fair trial. It seeks for the most part to invoke as a ground for a new

trial the cumulative effect of all the assigned errors. However, such assignments, taken separately, are so patently not well taken that any cumulative effect which they may have collectively would merely magnify the lack of merit in each.

Counsel specifically interposes the question of the trial judge's alleged misconduct. He argues that the trial judge was inflamed and prejudiced against the defendant. The record does not disclose such an attitude nor any misconduct whatsoever, within the rule laid down in *Territory* v. *Van Culin, ante* p. 153. Therefore, the only conclusion possible is that the raising of such a question and the argument of counsel were frivolous.

The defendant was afforded a fair and impartial trial throughout. He was given the severest penalty known to the law, but a careful examination of the record discloses no ground upon which the judgment should be disturbed nor do the interests of justice require it.

Judgment affirmed.

*J. V. Esposito* (*E. A. Towse* with him on the briefs) for defendant, plaintiff in error.

*C. E. Cassidy,* Public Prosecutor (also on the briefs) for the Territory.