# Young v. Commonwealth

(Decided Jan. 17, 1936)

W. L. HAMMOND and .JAMES S. WILSON for appellant.

BAILEY P. WOOTON, Atty. Gen., and RAY L. MURPHY, Asst. Atty. Gen., for the Commonwealth.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Between 7:30 and 8 o'clock p. m., on August 1, 1935, the appellant and defendant below, Homer Young, a colored man about 38 years of age, shot and killed Enoch Beeler, a white man who .was his senior, and which occurred at the corner of Exeter avenue and Twentieth street in the city of Middlesboro, in Bell county, Ky. A special term of the Bell circuit court was called to investigate the occurrence, and the grand jury returned an indictment against defendant on the 12th day of that month in which he was charged with murder. The trial of the indictment was set for the 15th of that month, and to which defendant consented, or at least interposed no objection. On that day the commonwealth and defendant through his counsel announced ready for trial, resulting in his conviction of the crime with which he was accused, and fixing his punishment at death. His motion for a new trial was overruled, and from that order and the judgment pronounced on the verdict he prosecutes this appeal, urging through his counsel these errors as grounds for a reversal: (1) That defendant was precipitately tried without proper time to prepare his defense; (2) improper admission of testimony offered by the commonwealth over defendant's objections; (3) improper argument of commonwealth's attorney in addressing the jury, and (4) the death sentence was not justified by

the evidence and circumstances proven in the case—
each of which will be duly considered and determined
in the order named, but before doing so we deem it
proper and necessary to make a brief statement of the
facts established by the testimony.

The deceased and his wife with some infant chil-
dren resided about two blocks from the residence of
Mrs. Elizabeth Salyers, which is located at one of the
corners of the junction of the two streets of Middles-
boro, supra. She had two sons, Orville Salyers, about
25 years of age, and Garland Salyers, about 19 years
old. The Beelers, with their children, had gone to the
Salyers residence on a visit, arriving there somewhere
about 7 o'clock. Deceased was intoxicated at the time
and had been drinking more or less throughout the
afternoon. Just across the street from the Salyers
residence was a lunch and soft drink stand, and at
which, perhaps, other articles were sold. Deceased and
Garland Salyers made two trips across the street from
the Salyers residence to the lunch stand after he and
his family arrived at the Salyers home. At the time
of the second one the elder Salyers boy had retired for
the night, but the reason for his early retirement is no-
where stated in the record. Upon the return of Gar-
land Salyers and the deceased from the second trip
made to the lunch stand, they met defendant at the
corner of the Salyers lot which was one of the corners
made by the junction of the two streets. Deceased had
a flask of liquor in one of his pockets and at least he,
if not young Salyers also, was considerably intoxicated.
In addition thereto, the former was more or less lo-
quacious with persons meeting him and whom he saw
proper to address. Mrs. Beeler and Mrs. Salyers were
sitting on the front porch of the latter's residence and
saw deceased and young Salyers as they crossed the
street from the lunch stand to the corner of the Salyers
lot and, as they claim, they continued to observe them
when the two met defendant at the corner of that lot.
Defendant was approaching from the opposite direc-
tion, and just before he met the two he stepped from
the walk to the adjacent grass plot lying between it
and the curbing of the street, and which point was near
a telephone post. They each testified that deceased, on
discovering defendant, spoke to him and said, "Hello,
pal of mine," when defendant drew his pistol and shot
deceased in the left arm and about the time he passed

opposite defendant, and that just after he passed him a second shot was fired which took effect in the back of deceased, and from the effects of which he soon died.

The testimony of those two witnesses was substantially corroborated by Garland Salyers, who had crossed the street with the deceased and had hold of one of his arms. All three of those witnesses positively stated that deceased made no threat nor addressed any insulting language towards defendant, nor did he have a weapon of any kind in either of his hands, nor anything therein resembling a weapon. There was no light located at the corner of the street where the homicide occurred, but there were lights on the front porch of the confectionary across the street, which was about thirty feet wide at that point.

Defendant in describing what occurred said: "I was coming down 20th Street going to town and I came there to the Salyers home and Mr. Beeler and a young man with him were coming across the street coming south and I was going north, and they stepped up on the sidewalk and I seen he was drunk, and this boy, whoever he was, he had hold of Mr. Beeler's right arm, and when they got up on the sidewalk I seen they was drunk, or one of them was drunk anyway, and I steps off the sidewalk into the street to let them have all the sidewalk, and they came on and Mr. Beeler steps back and said 'Come on by,' and he flourished a pistol, looked like it might have been a 38 squeezer, a short black pistol, and naturally I wouldn't go by a man and him with a pistol in his hand and intoxicated. Mr. Beeler was right over here. There isn't any concrete along there; it is just dug out for the concrete there and he had just come upon the curb and on this dirt and he steps back and this boy still had hold of one arm and he flourished his pistol and said, 'Come on by; come on by' and I didn't know who he was and I got behind the post and I thought he would go on and he did go by and then turned back to the post." He furthermore stated that the two women sitting upon the porch, whom he did not know, said to deceased, "Don't do that Enoch," and at that time he (deceased) had a pistol in his hand which he was pointing at defendant, or endeavoring to do, "and that was when I fired." Later he stated: "I thought he was trying to shoot me. It looked like he was. I fired then to keep

him from shooting me." After the second shot deceased left the scene hurriedly and soon landed at the Cumberland Hotel, where he arranged to surrender himself to the officers, which he later did.

The testimony shows uncontradictedly that defendant bore a good reputation in that community; that he was sober and industrious and no one attempted to impeach his reputation for truth and veracity, morality, or in any other particular. He was employed at the time, and had been for a considerable time, as watchman and guide on the "Pinnacle," a high mountain point at Cumberland Gap, near Middlesboro, and had worked as such until 6 o'clock p. m. on the day of the homicide. At the time he met deceased and young Salyers he was going from his home to the central part of the city. He and deceased were well acquainted, and it is affirmatively shown that they were friends and had never had any trouble prior to the fatal occasion. Having stated this much, we will now return to a discussion of the grounds relied on for a reversal of the judgment.

■ Ground 1, supra, is not even complained of in the motion for a new trial, and there is not a fact appearing anywhere in the record remotely indicating that defendant was prejudiced because of the matters therein complained of. Not the slightest suggestion is anywhere made that any witness or any kind or character of evidence could have been produced by a postponement of the trial to a later date, and the only time or place wherein this ground is mentioned is in brief of counsel on this appeal. Moreover, as we have seen, no objection was made to the setting of the case for trial at the time it was done. Under the circumstances it would be futile to further discuss this ground, since what we have stated, as indisputably shown in the record, conclusively demonstrates its lack of merit, and we will not encumber the opinion by citing prior substantiating ones of this court so declaring.

■ Several items of evidence which the court admitted are complained of under this ground, and we will dispose of them in the order in which they are discussed in brief. Mrs. Beeler was asked the question: "Tell the jury if either Salyers or your husband did anything or attempted to do anything to Homer Young?" To which she replied in the negative. Seri-

ous criticism is made of the use of the word "attempted" in the question, it being contended that it implied what was going on in the mind of the deceased, which the witness could not know. However, we are not inclined to so construe the scope of that inquiry. The word, as employed in the question, clearly indicated that the questioner was endeavoring to ascertain what were the outward actions and physical manifestations. of the deceased at and during the meeting with defendant, and not as making any inquiry as to what was going on within the mind of the deceased. We, therefore, discover no erroneous action on the part of the court in overruling the objection to that question.

Defendant was asked while on the stand: "Are you working anywhere?" The court sustained the commonwealth's objection to that question, but upon what ground we are uninformed, although we think it was error to do so. However, that error was cured by the next question, which was, "What have you been doing?" the answer to which was that he had been and was then engaged in the occupation hereinbefore mentioned. Clearly, in such circumstances, the error complained of, if one, is without merit. During the course of the examination of defendant he was asked as to what he stated to people in the Cumberland Hotel after he arrived there shortly following the homicide. The court sustained objection to that question, but there was no avowal made. If, however, there had been, the error was cured because witness (defendant) immediately thereafter stated that, "I had one of the boys ring the officers up at the city hall." It is therefore apparent that this error is also without merit. Defendant was also asked, "What; if anything, did Enoch Beeler do to you before any shots were fired?" The commonwealth objected to the question and the court sustained it, but the witness answered immediately, "Drawed a gun on me," and that answer was permitted to stand. This alleged error must, therefore, share the fate of the others supra.

In the cross-examination of defendant the commonwealth's attorney asked him this question: "You saw him plain enough to shoot him right square in the middle of the back, didn't you?" Defendant's objection to that question was overruled, but no avowal was made except defendant answered: "I wasn't.

aiming at him, I was just shooting. * * * I was going to keep him from shooting me." Clearly this alleged error is wholly without merit, although it is seriously argued that the second shot of defendant, and which was the fatal one, was not "square in the middle of the back," since it penetrated the back of the deceased some two or three inches to the left of his backbone, but, of course, in his back, although not *squarely* in the middle thereof. During the examination of some of the character witnesses, the commonwealth's attorney on cross-examining them, by way of testing the accuracy of their testimony, inquired about some prior conduct of defendant which the witnesses stated that they knew nothing about, except the killing for which he was on trial. Such practice has never been disapproved by this court, unless it was indulged in to such an extent and in such a manner as to clearly indicate the purpose and intent on the part of counsel indulging in it to prejudice the case by injecting into it matters which had no factual foundation. No such purpose appears in this case, and the examination of counsel did not exceed universally approved bounds. Having disposed of all of the items discussed in brief relating to this ground, and finding no error therein, it follows that it should be and it is also denied.

■ The commonwealth's attorney in making his closing argument to the jury, as shown by the bill of exceptions, made these remarks:

(a) "You have either got to do one of two things: You have got to electrocute this man or else turn him loose."

(b) "I am putting this up to you. If there is one of you that believe in the death penalty and feels that the evidence produced by the commonwealth justifies it, don't compromise with any man who wants to hold out for a life sentence."

(c) "Throw out everything in the instructions except these things. Throw out the self-defense and there are only two things: 'Did he do it; and did he have it to do?'"

(d) "If you can't write a death verdict in this case, write out an acquittal."

(e) "We have a lawyer here in town who has great trouble with his clients. It is Loge Hammond (meaning W. L. Hammond) and the trouble with his clients is that they shoot people in the back, and this is another case that Loge Hammond ditched, and— (Defendant objects.)

"The Court: I sustain the objection as to the illustration about Mr. Hammond. Gentlemen you will not consider that.

"Commonwealth's Attorney: I don't mean that Mr. Hammond was sought to be employed in this case. I just mean that this case is similar to some he had had and that he is not in this one. I will put it this way, Judge, we have many cases of men being shot in the back."

Argument (a) was clearly but an expression of the views of the attorney as gathered from his appraisement of the testimony in the case. Argument (b) was but an appeal for each individual juror to stand by his convictions whatever they might be without any showing of surrender. Neither of those arguments transgress any limitations that we have heretofore approved with reference to such arguments. Argument (c) is susceptible to only one interpretation, which is plainly expressed in counsel's language saying: "Did he do it; and did he have it to do." When the objection was made thereto, the court remarked in the hearing of the jury, "That is the commonwealth's attorney's argument," thereby conveying to the jury the idea that its members should be governed by the evidence and the instructions of the court. But, after all, the attorney correctly stated the issues, one of which defendant admitted, and which was that he did shoot and kill deceased. He claimed that he had to do so in the exercise of his right of self-defense, and stated the facts supporting that defense, but which the witnesses for the commonwealth contradicted; and it would be extremely technical, and what we conclude as wholly unwarranted, to characterize the argument as prejudicially erroneous. Especially so in view of the remarks of the court to the jury in response to the objection when it was made. All of the arguments were responded to by the court in this language: "The jury will be con-

trolled by the instructions. and the evidence herein. The commonwealth's attorney has been giving you his theory of the case, but after all, you are the jury and you have the instructions and the indictment and the evidence, and those are the things to control you.'' Surely in the light of such admonition, made at the close of the argument of counsel, if regarded by the jury at all, removed any adverse influence that any portion of the argument may have produced.

In view of that admonition of the court following the objection to argument (e), the final one, and in view of the fact that, after all, it was but calling the attention of the jury to the fact that deceased was shot in the back (which the evidence indisputably showed), we fail to perceive any support for the contention that it was improper, since its purpose was to combat defendant's plea of self-defense. The fact that Judge Hammond, who was referred to by counsel in that argument, had represented some clients who were confronted with similar adverse testimony, could not prejudice the rights of the instant defendant, even if he had been representing defendant at that time, but which, however, was untrue, since he appeared in the case for the first time on this appeal, and which fact the argument itself, together with what occurred at the time, completely developed. No fact was urged by counsel in his closing argument for which there was not testimony to support, and no such complaint is made. None of the arguments referred to transgress any allowed limitations set forth in any of the cases relied on by counsel in support of this ground. They are: East v. Commonwealth, 249 Ky. 46, 60 S. W. (2d) 137; Bennett v. Commonwealth, 242 Ky. 377, 46 S. W. (2d) 484; and Ayers v. Commonwealth, 195 Ky. 343, 242 S. W. 624. Others are referred to in those opinions, and when their facts are compared with those in this case, it will be found that the objectionable arguments herein fall far short of any of the transgressions found in the ones condemned by us in our prior decisions.

■ In approaching the discussion of ground (4), we do so with full appreciation of the enormity of the punishment inflicted by the jury's verdict, and frankness compels us to say that if we had occupied the place of the juror in the trial of this case we would

not, under the facts and circumstances proven by the record, have consented to that punishment. We are led to so remark because of the general impression of the case created by the facts adduced, and the absence therefrom of any murderous motive which is almost universally present in homicides meriting the death punishment. Notwithstanding such absence, it is realized that premeditated malice may be suddenly formed, and that the unusual course is sometimes pursued by takers of human life. However, this case seems to be surrounded by an atmosphere antagonistic to such a conclusion, since, as we have seen, there had theretofore existed a friendly relationship between the perpetrator of the crime and the victim thereof. Also the former (defendant) proved a good character as relates to all of the qualities necessary to make an upright and law-abiding citizen. However, we are not at liberty and do not possess the authority to boldly set aside the testimony of the three eyewitnesses to the killing who were introduced by the commonwealth, or to say that we will disregard their testimony; and especially is that true when their narration of what transpired at that time is not weakened by any express contradiction, save and except the testimony given by defendant himself. That the deceased was drinking goes without saying. That he had accosted some passer-by but a minute or two before his meeting with defendant and directed to him some language usually indulged in by intoxicated persons of the nature and character testified to by the prosecuting witnesses in his addressing defendant as "pal of mine," may be admitted; but no act of viciousness on his part was proven or attempted to be proven by any witness appearing in the case, save and except defendant himself, who under his own testimony, as we are convinced, drew his pistol and shot deceased at a time when it was not reasonably apparent that he was in immediate danger, and that he shot too hastily. However, if that be true it would call, not for an acquittal, but for an amelioration of his punishment, and which we are inclined to think should have been done in this case, and which would have been sufficient punishment rather than to have imposed the death penalty, but which we as a court have no authority to undo.

Wherefore, for the reasons stated, the judgment is affirmed.

The whole court sitting.