## Golden v. Commonwealth.

(Decided Nov. 1, 1938.)

HIRAM H. OWENS for appellant.

HUBERT MEREDITH, Attorney General, and J. M. CAMPBELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

The appellant, Green Clay Golden, having been indicted by the grand jury of Knox county, charging him with the willful murder of Simon Blanton, committed by shooting and killing him, he was upon his trial on the charge found guilty and his punishment fixed at life imprisonment.

The only grounds urged for reversal of the judgment are: (1) The alleged error of the court in admitting prejudicial evidence; (2) that the court should have directed the jury to acquit appellant; and, if not that, then an instruction on temporary insanity should have been given; and (3) the alleged prejudicial argument by the commonwealth's attorney.

It is here undenied that appellant shot and killed Simon Blanton when they met in the court-house square of Barbourville, Kentucky, on the afternoon of November 3, 1937.

The commonwealth contended that the killing was done willfully and with malice aforethought and not in

the accused's self-defense or when temporarily insane, or even in sudden heat and passion.

The appellant's claim, on the other hand, is that at the time he shot and killed the deceased, he was advancing on him with a knife and that it was necessary to shoot and kill him to save his own life.

The record shows that the appellant lived some three or four miles out from Barbourville, the county seat of Knox county, on the farm of Wiley Saylor, where he and his large family worked the farm as tenants and all together occupied his small three-room residence with him.

Further, it is shown that the deceased, Simon Blanton, a married man, lived with his two bachelor brothers, Garrard and Floyd Blanton, on their large farm some two miles further distant from Barbourville and down the road, beyond the appellant's home.

It is also shown that more than a year prior to the homicide, the deceased's brother Garrard Blanton had seduced and gotten with child appellant's young fifteen year old daughter, Sally Mae, and that on the day before the appellant's tragic shooting of Simon Blanton occurred, this young, deserted mother had carried her bastard child to the home of its father, Garrard Blanton, to be there provided and cared for by him, and from there went on in search of employment.

In the afternoon of this same day, Simon Blanton went with one Hensley to carry this illegitimate child back to its mother at the appellant's home. On arriving there at Golden's home, Hensley took the baby into the house and delivered it to appellant's wife and daughter-in-law. Hensley also at the time asked Mrs. Golden if he might leave his saddle bags there with her and that he would get them as he came back from Barbourville that night. He told them that his pistol was in the saddle bags which he took out, unloaded it and put it back in them.

It appears that while Hensley was thus engaged in the home, the deceased, Simon Blanton, got out of the car and walked to its rear to urinate at the time the appellant's little ten year old granddaughter was walking by, when Blanton, willfully turning himself so as to front her and the women in the home, made an indecent ex-

posure of his person before them, and when reprimanded by the appellant and the father of the child for thus insulting his family, and told to stop and go to the barn for such purposes, he answered, "I will do this anywhere I want to. It is none of your g. d. business what I do."

It is shown that this act of indignity and contempt on the part of the deceased for the humble womanhood of appellant's family greatly excited and enraged both the appellant and his son, the child's father, when their efforts to put a stop to his indecent exposure of his person only elicited from him jeering replies and oaths.

Further the evidence is that early the following morning the appellant took the pistol of Hensley, which he had left the day before with appellant's wife, procured other cartridges with which he reloaded it, when, with his son, Jim, he started about five o'clock to go to Barbourville, to there procure an indictment against Garrad Blanton on the charge of having seduced his daughter, but which he failed to get, as he was told he could not get an indictment upon his testimony, but would have to produce his daughter, Sally Mae, to present her complaint to them.

It is testified by some of the commonwealth's witnesses that they saw the appellant and his son Jim in Barbourville before the homicide occurred, and heard them talking, and that they were "on the lookout" for deceased.

As to this, the witness, Cecil Scott, testified that his attention was attracted to appellant and his son as they walked towards the front of the courthouse when he heard Jim, appellant's son, say, "Where's the son o. b. gone to?" when Green (the appellant) said, "Come on here—come on Jim," and that they then turned and started walking off and that he didn't see them any more until the later shooting when he was standing about the same place, "when he turned around and seen the boy lying on the ground * * * kinder on his face; * * * that Green walked up behind him, more on the right side and reached over * * * and fired in his back;" that as he was shot, "Simon was kinda moving, raising kinda up, a little every time he shot him—just barely;" that the appellant shot him, "the best he could remember," about four or five times right between the

shoulders and hips; that the boy (Golden's son, Jim) acted like he was trying to hold the appellant when he jumped on the right side of deceased and "put the gun to his head the last time" and shot him as he lay with his face toward the ground; and that he heard appellant's boy say to him, "Look, what you have done."

Owen Hibbard, also a commonwealth witness, states that when the first shot was fired, "I looked around and there was another shot fired and the man (Blanton) was pitching right toward me"; that after that four more shots were fired right close together and it "looked like he (appellant) was shooting right at his head." When asked, "Did the man that fell ever do or offer to do anything after you looked?" he answered, "Not a thing in the world. Everything I heard the man that got killed say was, 'Lord, have mercy on me.'" When asked, "Did you hear the defendant make any statement?" he answered, "Never heard him say nothing, only he says, 'You g. d. s. o. b.'" which he said when he was shooting him; that he "had the pistol right down on him." Witness states that he was standing there when the body was picked up, but that he did not see anything in the way of weapon on the ground or in Blanton's hand, or about him.

Gowess McDonald, another commonwealth witness, stated that he was a policeman of Barbourville, and while he was standing near the place where this homicide occurred, his attention was attracted by the sound of shots; that he looked and saw a man on the ground; and another man shooting; that he went over and put the man who did the shooting under arrest and demanded his gun, which he gave him. When asked as to what was the then manner of the appellant, whether he was greatly agitated or excited, he answered that there was "something bad wrong," and that he didn't seem to be in a normal condition; that he didn't know how to describe his condition, but that appellant was "just shaking and jerking, saying, 'Keep the crowd back—I had to do the shooting.' He was just all to pieces;" that appellant then said, "He was coming on me with a knife," and that he had to shoot him, though he further testifies that he saw no knife there; that he took his prisoner, the appellant, into the courthouse to protect him.

Without further detailing the testimony of the sev-

eral witnesses as to the circumstances of this homicide, which may be summarized as showing by practically every commonwealth witness, some of whom were standing within a few feet of the appellant at the time he shot the deceased, that the appellant shot deceased in the back and at a time when deceased was not in anywise harming or threatening to harm appellant nor when he either had or displayed any weapon with which he could harm him.

Some of the witnesses did state that after deceased was shot down by appellant and his body was being moved that they saw a white handled knife lying on the ground by the deceased, about the middle of his body or where he had lain and that the knife was closed or only slightly open. A deputy sheriff, Smith, who was present at the arrest, testified that the knife was closed when he found it by the deceased and picked it up.

Nearly all of the commonwealth witnesses state that the deceased fell away from the appellant when he had twice shot him and that, after he had fallen on the ground, the appellant stood over him and fired three or four more shots into his back or head.

It is stipulated that the deceased was killed by these shots, fired by the appellant.

The commonwealth further sought by the introduction in evidence of the clothing and cap worn by the deceased when he was shot to establish that the bullet holes made by the shots therein showed that "the fiber had been pushed out" and that the holes in the front of the garment were larger, which they argued demonstrated that the bullets had passed through the body, entering from the back, and been so bent and expanded in passing through the body that they made larger holes at their exit in the front of the garments than where they entered, which supported the commonwealth's theory, also established by the testimony of many witnesses, that the shots were fired by the appellant from the back of the deceased.

Further, the commonwealth witness, R. T. Johnson, testified that he had talked with appellant shortly after the deceased had made the indecent exhibition of his person in front of appellant's granddaughter and his home, when appellant was still wrought up and angered because of it, and that he had said to him, "If I could

get my gun, I would kill the s. o. b." and that he had said he didn't want the bastard baby the deceased had just brought back to his home and that he "would show them in the morning. They will do something with it."

Appellant, when testifying in his own behalf, and by his several witnesses, undertakes to refute and answer the commonwealth's charge, that this killing of the deceased was a willful killing of him and done with malice aforethought, by claiming that he had been so harassed and torn to pieces by the indignity offered his family by the deceased in the indecent exposure of his person before them and by his grief and humiliation caused by the seduction of his daughter by Garrard Blanton, deceased's brother, and that these wrongs had weighed so heavily upon his mind he had been unable to sleep the night before the killing and that he did not realize or remember, after he fired the first shot into deceased, what else he did nor anyone he saw, until after he had been arrested and lodged in the jail for having killed him.

Further, he sought by his testimony and that of his witnesses to show that he had not shot the defendant willfully or with malice aforethought, but that he and his son, the mission of his trip to Barbourville having failed, were walking across the court house square to get a taxi to carry them home, when they were accosted by the deceased; that when about four steps from them, he called to them to "hold on a minute" and jerked a knife out of his pocket, saying, "You g. d. onery s. o. b., I will kill you," when he (appellant) stepped back two steps, jerked out his pistol and shot; that deceased was at the time coming on him with his knife in his hand, half open; that after he fired this first shot, he didn't know what happened, that he did not recognize people after firing the first shot until after he had been arrested and put in jail. He testified that he didn't remember whether he had called any of the officers who gathered about him after the shooting by their names, though several of these officers, who took him into the courthouse so as to protect him against the threatening crowd, testified that he both recognized and talked with them and, when told that the crowd was threatening him, he asked them to keep the crowd back and when told that they would, that he had said, "If they want to shoot, give me one of them guns and let them

shoot." He also testified that he did shoot the deceased several times, but that he had to do it.

Such is the extent of the testimony offered upon the trial in the effort to show that the appellant was temporarily insane, and without the power of knowing right from wrong at the time he shot and killed the deceased, though even he does not claim that he was not in full possession of his faculties and understood and recognized what he was doing when firing the first shot, but only when he fired the four or five following shots.

Further, there appears no testimony tending to support appellant's claim that he shot the deceased in self-defense, other than the evidence as given above by the appellant, in which he was corroborated by that of his son, to the effect that the deceased had at the time he was shot drawn a knife upon him and was threatening to harm him and because of which he had to shoot the deceased in his self-defense.

We therefore are not authorized, in view of the showing made by this evidence, however strongly we may sympathize with the appellant because of the heavy wrongs he was called on to bear at the hands of these autocratic and malevolent neighbors, to concur in appellant's contention urged, that because of the provocation given appellant by these things, we should hold that the jury's verdict, finding the appellant guilty upon this evidence of murdering the deceased, was flagrantly against the evidence and called for his acquittal or that, as further contended, if such finding were not viewed by us as entitling defendant to an acquittal on the ground of self-defense the court should have given an instruction on temporary insanity, for while it is a well settled rule that it is the duty of the trial court in a criminal case to instruct the jury on the whole law of the case, whether requested or not, or, as differently stated, that instructions applicable to every state of case deducible from the testimony or supported by it to any substantial extent should be given (Com. v. Saylor, 156 Ky. 249, 160 S. W. 1032; Joy v. Com., 203 Ky. 426, 262 S. W. 585; Moseley v. Com., 206 Ky. 173, 266 S. W. 1048; Patrick v. Com., 234 Ky. 33, 27 S. W. (2d) 387), it is yet the rule that the instructions given must be based upon evidence supporting the instructions; and, conversely, that the jury should not be instructed upon

a theory of the case not supported by the evidence. McCoy v. Com., 149 Ky. 447, 149 S. W. 903; Gamble v. Com., 151 Ky. 372, 151 S. W. 924; Middleton v. Com., 136 Ky. 354, 124 S. W. 355; Allen v. Com., 86 Ky. 642, 6 S. W. 645, 9 Ky. Law Rep. 784.

The killing is not excused on the ground of self-defense because victim has destroyed defendant's home, by debauching his child if victim made no overt act or threat against the defendant at the time of shooting him. Cottrell v. Com., 271 Ky. 52, 111 S. W. (2d) 445.

The evidence as to this, as hereinabove recited, is not to the effect that the appellant did not understand what he was doing when he claims he drew his gun and fired the first shot into the deceased in his necessary self-defense or that he was at such time so temporarily deranged or mentally incapacitated because of his troubles that he did not know the right from the wrong of the act he was then committing, but he only testifies that he didn't remember anything further that occurred after firing the first shot, nor did he recognize anyone until after his arrest, and lodgment in jail, though even as to this he is not certain, in that, when confronted with the testimony of the arresting officers, that he did recognize them and call them by name when talking with them, as they sought to protect him from the threatening crowd, his only answer was that he didn't remember if he did, and further, he did not deny that he, before being lodged in jail, entreated the officers, not as an insane but as a terrified man, realizing his situation of danger because of what he had done, to keep back the crowd, and stated that if they wanted to shoot to give him one of their guns and let them shoot.

Clearly such being the showing of this evidence, we conceive that it does not admit of casting any doubt upon the sanity of appellant. The mere fact that appellant, because of his embittered mind and hatred against the Blantons, shot and killed Simon Blanton did not tend to convert or render his maddened impulse to shoot the deceased and his shooting him, no matter how violent the impulse or cruel the manner in which executed, into evidence of such temporary insanity or unsoundness of mind as to excuse his intended and willful homicide.

We have too often declared the rule to be, as stated

above, that to authorize an instruction on insanity, there must be some evidence of a diseased mind or something more than a violent, uncontrollable desire to kill; and if in a state of anger one takes the life of another, he is not excusable on the ground of insanity.

In Howard v. Com., 224 Ky. 224, 5 S. W. (2d) 1056, we said [page 1057]:

"Ungovernable passion does not constitute insanity. A paroxysm of jealousy or sudden anger * * * is no excuse for the crime. It is the duty of one whose will power is not impaired by disease to govern and control his passions. Fitzpatrick v. Com., 81 Ky. 357, 5 Ky. Law Rep. 363. In McCarty v. Com., 114 Ky. 620, 71 S. W. 656, 24 Ky. Law Rep. 1427, this court said:

" 'It must be the contention of appellant's counsel, that any impulse that at the time may be irresistible, will excuse homicide. Happily for society, this is not the law * * *. Only persons insane, or who have never reached years of discretion, are not accountable for the commission of crime. Even then the insanity that excuses is such as deprives the person committing the act of his reason or will in that particular transaction. The irresistible impulse recognized by the law is that only resulting from mental disease—from the derangement of the mind caused by a disease of the mind. * * * A person acts under an insane, irresistible impulse when, by reason of the duress of the mental disease, he has lost the power to choose between right and wrong, to avoid doing the act in question, his free agency being at the time destroyed.' "

Such being the showing made in this case, it is our conclusion that the appellant has no just ground of complaint in that the court did not here instruct the jury on momentary insanity.

Further, the appellant contends that the court committed prejudicial error in permitting the jury to take to their room the clothing and cap worn by the deceased at the time he was killed.

In this contention, too, we feel that appellant is in error.

The ruling of the court, permitting the jury to carry

these garments and cap to its room, was evidently understood as being permitted not for influencing their feelings but for the purpose of the jury's inspecting the bullet holes in the garments for such informing evidence as their inspection of them might afford them in reaching their conclusion upon the material issue as to whether or not appellant had shot the deceased in the back or when he was facing him and coming on him with a knife.

This was a most material issue in the case and the jury was entitled to have given it all the evidence, even including the blood stained garments worn by the deceased, where such was the purpose or intended effect of their viewing the deceased's clothing, and from their study of the nature and character of the shot holes in the garments to determine their point of entrance and exit and whether the deceased was shot by appellant as he stood with his back to him.

Also, the appellant complains that he should be given a new trial because of the severity of the jury's verdict, in its inflicting upon him the punishment of life imprisonment.

However, in view of the controlling rule in the matter of changing the jury's finding of the degree of punishment, it may be said that even conceding that the degree of punishment here inflicted was, it would appear, severe in the light of the abuse heaped upon the appellant time and again by the deceased, we are yet without authority to make any change in the amount of punishment fixed by the jury, in that as long as the punishment inflicted comes within the terms of the statute fixing the punishment for the particular offense condemned, its action is final and not to be disturbed by the court upon its finding that the particular offense was committed.

This rule is stated in 15 Am. Jur. section 526, page 174, in discussing the subject of the severity of a particular sentence, as follows:

"If the statute is not in violation of the Constitution, then any punishment assessed by a court or jury within the limits fixed thereby cannot be adjudged excessive, for the reason that the power to declare what punishment may be assessed

against those convicted of crime is not a judicial power, but a legislative power, controlled only by the provisions of the Constitution.''

To the like effect was it said in Crutchfield v. Com., 248 Ky. 704, 59 S. W. (2d) 983, that [page 985]:

"The Legislature is the judge of the adequacy of the penalties necessary to prevent crime, and unless it clearly and manifestly appears that the punishment fixed by that body is cruel and unconstitutional the courts will not interfere.''

See, also, Fry v. Com., 259 Ky. 337, 82 S. W. (2d) 431.

Another assignment of error urged by appellant is that the commonwealth was permitted to untimely call to the stand and ask appellant (towards the end of the trial) whether or not he had ever been theretofore convicted of a felony. He answered that he had been convicted on the charge of shooting. Appellant complains of this. The court properly allowed the question to be asked, though should have, had the appellant then requested it, admonished the jury as to the single purpose for which such evidence was admissible—that it might be considered by the jury as limited to impeaching the credibility of the witness. However, no such admonition was requested and, when the evidence was so admitted, the commonwealth's attorney was authorized to argue his inferences from the fact of appellant's having been before convicted of the offense of shooting and in doing so was not guilty of improper conduct.

Appellant complains of further misconduct on the part of the commonwealth's attorney in his closing argument to the jury upon the ground of his alleged making of inflammatory statements, misquoting the evidence, misconstruing the facts, and warping the reasonably truthful intendment of the evidence.

A few of such alleged reprehensible statements are recited in the bill of exceptions and are as follows:

(a) "He, the defendant, got so mad he didn't sleep all night—he admits that himself.''

(b) "Everybody except one witness, the defendant and his son, says he was shot five times in the back.''

(c) "According to this record, he, the defendant, had been convicted before for shooting. He knew what he was doing. He was an experienced hand at the business."

(d) "The evidence shows that Garrard Blanton was not at home, was not in the county on the day of the election, but was in another county."

(e) "I know there are five holes in the back of this man's coat, one apparently powder burned and four holes in front that are larger than those in the back."

(f) "I know that this man had on a cap and in the crown of that cap there is a hole, with some discoloration, like the discoloration in the back of the coat."

(g) "I know you will never stop killing in Knox county and in Kentucky and in all the world if you give a man a penitentiary sentence that commits a crime like this."

We have considered this objection as to these remarks, made in argument of commonwealth's attorney, as being improper and also the objection made that the court, even in the instances in which it admonished the jury not to consider any of them, had untimely done so, which served not to correct the effect of the remarks but rather to emphasize them through calling them to the jury's memory.

Where the court was of the opinion that the argument made stated facts outside the record, or stated as evidential matters outside the record, or misstated the record, it admonished the jury to disregard them, but overruled the objection to the others on the ground that they were reasonable inferences drawn from the evidence and were within the latitude of argument allowed the commonwealth's attorney, and such being our view of the argument made, we are led to conclude that the same was not prejudicial or served to deny the appellant a fair trial. Here, as stated by us in the case of Young v. Commonwealth, 263 Ky. 683, 93 S. W. (2d) 10, 14:

"No fact was urged by counsel in his closing argument for which there was not testimony to support.

\* \* \* None of the arguments referred to transgress any allowed limitations set forth in any of the cases relied on by counsel in support of this ground.''

We are, therefore, led to conclude that the appellant has here had a fair trial, wherein was properly given instructions upon the evidence heard or supported by any substantial evidence and the jury from that evidence and under proper instructions, as well as rulings made upon the introduction of evidence, has found the defendant guilty, as charged in the indictment, of willful murder, and while it may be conceded, had we constituted the jury hearing this evidence establishing the defendant's guilt of shooting the deceased but also showing the grievous wrongs suffered by him, shadowing and disgracing him, that we would have been inclined to have found such evidence potent to ameliorate the severe sentence here meted out to the appellant. However, as the sentence imposed is within the terms of the statute, Kentucky Statutes, section 1149, imposing a life imprisonment penalty-for the perpetration of murder and the jury having found that such was the degree of the defendant's crime committed, the measure of the punishment having rested solely with the jury, we are constrained to not disturb its verdict and the judgment of the court thereon is affirmed.