# Harrod v. Commonwealth.

January 10; 1950.

S. Rush Nicholson for appellant.

A. E. Funk, Attorney General, and Walter C. Hardman, Assistant Attorney General, for appellee.

VAN SANT, COMISSIONER—Affirming.

Appellant was found guilty of the crime of breaking and entering into a storehouse, and having previously been convicted of two other felonies, was convicted of having violated the Habitual Criminal Act. He was sentenced to serve the remainder of his life in the Kentucky State Reformatory. He seeks reversal on the following grounds: (1) the Commonwealth failed to prove the venue of the crime; (2) the Commonwealth failed to prove a "breakin"; (3) the court erred in failing to instruct the jury on the law of insanity; (4)

the court erred in overruling appellant's motion for a new trial based on the ground of newly discovered evidence; (5) appellant's rights under the Federal and State Constitutions were violated by the court in admitting evidence obtained by "purported" confessions and admissions made by appellant to members of the Police Department of Louisville; and (6) the court erred to the prejudice of appellant by placing him in jeopardy without notice having been given to the Division of Hospitals and Mental Hygiene for an examination by a psychiatrist as prescribed by KRS 203.340.

The evidence reveals that on the night of December 9, 1947 two patrolmen of the Police Department of the City of Louisville were cruising on Second Street in that City a few minutes before 10:00 p. m. They observed a one-half ton pickup truck proceeding through a red traffic light at the intersection of Second and Liberty Streets. When they pulled alongside the truck, it swerved over the sidewalk, across a parking lot, and came to a stop in a dead end alleyway. Appellant alighted from the truck, and before he could escape was placed under arrest by the officers. The officers observed a safe in the backend of the truck. When questioned about the safe, appellant stated that it had come from a store on Jefferson Street between the Car Barn and Fourth Street. He could not remember the number of the building, but stated that the front door would be "wide open." He then stated "you have got me, now take me to headquarters."

From this information, the officers made an investigation and discovered that a delicatessen owned by Leon Goldstein at 330 West Jefferson Street (between the Car Barn and Fourth Street) had been broken into and a safe taken therefrom. The delicatessen had been locked by the proprietor at 7:30 p. m. and when discovered by the officers, the lock had been broken.

Upon his arrival at headquarters, appellant voluntarily admitted breaking into the store, taking the safe and hauling it away in the truck. He contended at that time that he had no accomplice although the officers estimated the weight of the safe to be between three hundred and four hundred pounds, requiring three of them to unload it at headquarters; however, he did disclose to

the officers the exact place in the store from which the safe was taken. At the time of his arrest, appellant was under bond for appearances in other cases and was released from custody. On the 31st day of January, 1948, he again was taken into custody and questioned concerning other unsolved cases. At that time, he admitted "casing" the premises of Mr. Goldstein in preparation for the breaking and entering therein. He stated that he gained entrance by use of a "jimmy bar" and that he was interested in the safe because of his impression that money belonging to the operator of a handbook located in the building was kept in the safe. He stated at that time that he was not at liberty to tell who his accomplice was. He again was released without the requirement of filling further bond. Since both confessions were made in the late hours of the night, a stenographer was not called to record the statements.

On the trial, appellant testified that he was hired to haul a filing cabinet by a man named York who was accompanied by John Beck and Frank Redmond. He said in pursuance of this employment he drove his truck to the restaurant and the other men loaded it. He was permitted to read his affidavit stating that York, Redmond, and Beck would testify to the same effect if they were present in person.

In support of his motion and grounds for a new trial, appellant introduced the affidavit of Ashton D. Marsh, which was dictated March 12, 1948 and signed and sworn to on the morning of March 13, 1948, wherein the affiant stated that he and a man known as A. L. York broke into the storehouse at 330 West Jefferson on the night of December 9, 1947, and removed therefrom one safe. That he and Olin Teal had engaged appellant to do some hauling for them representing that the merchandise to be hauled was furniture. That the breaking and entering was done out of the presence of appellant; the safe was waiting in the doorway when appellant arrived, and was thereupon loaded in the truck which was driven away by appellant in accordance with the terms of the contract. He further stated that he introduced himself to appellant under the name of John Beck. Later in the day of March 13th, Marsh signed another affidavit repudiating the first. In that affidavit, he said that he was not present when the crime was committed, and that

everything he said in the previous affidavit was "completely false." He stated that he was not with appellant, York, or Teal on the night the crime was committed, and that he did not break into the delicatessen on that or any other occasion.

On April 28, 1948, at a hearing on appellant's motion for a new trial, Marsh repudiated the second affidavit and confirmed the first. It was shown that Marsh was a fugitive from justice in other states, and was under a sentence of life imprisonment in this state.

Lieutenant Evans testified that he was a Lieutenant of the Police Department of the City of Louisville in charge of the Second District and was on duty the night of Decemer 9, 1947; that on that night the premises at 330 West Jefferson Street were broken into and appellant admitted to him that he committed the crime. This evidence was sufficient to establish the venue of the crime.

This officer likewise testified that appellant told him that he was the person who broke into the store, and he described the exact place the safe had been located in the store. The proprietor of the store testified that he locked the premises at 7:30 p. m., and when he arrived, after being notified by the police, he found that the lock was out of the door—"just a plain hole" —when he got there, and the lock was lying inside the restaurant. This evidence was sufficient to establish that the building was broken into and that appellant was the one who broke and entered.

At no time before, during, or after the trial did appellant contend or intimate that he was of unsound mind, either at the time of the commission of the crime, or at the time of the trial. At the hearing before the trial judge on the motion for a new trial, both counsel for appellant and the latter in person specifically were asked if either of them claimed that the defendant was of unsound mind. Both announced in open court that they made no such claim. It is obvious appellant was not entitled to an instruction on insanity.

In considering a motion for a new trial on the ground of newly discovered evidence, the court is privileged to exercise a reasonable discretion, and newly

discovered evidence which is cumulative only may not be relied on as a ground for a new trial, Osborne v. Commonwealth, 215 Ky. 748, 286 S. W. 1068, unless it is of such convincing nature as to satisfy the mind of the court that it would have a decisive influence in favor of the one offering it, should a new trial be granted. The newly discovered evidence relied on in this case is precisely that contained in the affidavit appellant was permitted to read to the jury on the first trial, with the exception that true names were substituted for fictitious ones. In Knight v. Commonwealth, 170 Ky. 763, 186 S. W. 667, the court held that where the newly discovered evidence was contained in an affidavit for continuance and, as here, actually read to the jury, the court did not err in overruling a motion for a new trial based on newly discovered evidence. In addition to that, we are of the opinion that the witness who would testify to the so called newly discovered evidence has made so many contradictory statements and has been convicted of so many felonies that his testimony would have no weight with a jury. Wherefore, we are of the opinion that the Trial Court did not err in overruling appellant's motion for a new trial on the groud of newly discovered evidence.

Appellant's contention that his rights under the Federal and State Constitutions were violated by the court, in admitting evidence obtained by his confessions, is refuted by his own testimony. He denied that he had made the statements attributed to him in the alleged confessions, and then was asked the following questions and made the following answers:

"Q. You admitted nothing as a result of what Lieutenant Joseph said to you, as you admitted you didn't know anything? A. That is right.

"Q. If you did give any information or what information you did give, did you give that or not on the assurance of Lieutenant Joseph that he was going to help you provided that you give him some information? A. If I did give him any, yes, sir."

The effect of this testimony is that the police officers elicited no information from him, and his statement that, if he gave them information, it was the result of

a promise to help him has no weight in the face of the contention that he did not confess to the crime.

It is conceded that the Clerk of the Jefferson Circuit Court failed to give written notice to the Division of Hospitals and Mental Hygiene that appellant had been indicted under the provisions of the Habitual Criminal Act, KRS 431.190, within seven days after the indictment was found, as is provided in KRS 203.340, which reads:

"203.340 Mental examination of habitual criminals. (1) When a person who has been twice previously convicted of a felony, is indicted by a grand jury as an habitual criminal, the circuit clerk of the court in which he is indicted shall give notice of the indictment to the Division of Hospitals and Mental Hygiene within seven days after the indictment is returned by the grand jury, on a blank supplied by that division. The director of the division shall cause such person to be examined by a psychiatrist already in the employ of the department, to determine his mental condition and the existence of any mental disease or defect which would affect his criminal responsibility. This examination shall be made without expense other than the amount to cover necessary travel, as provided by law for any other employe of the state traveling on official business.

"(2) The psychiatrist making the examination shall submit a written report of his findings to the judge of the court having jurisdiction, who shall make the report available to the prosecuting attorney and the attorney for the defendant."

"(3) The director may decline to cause such examination to be made if the number of psychiatrists on duty in the department is insufficient to spare one from his regular official duties, in which event the director shall notify the clerk of the circuit court to that effect within three days."

This statute was an Act of the General Assembly in its second extraordinary session of 1938, c. 1, the title to which deals with the powers, duties, and operation of the Department of Welfare. The purpose of the Act is to permit the Department of Welfare to determine whether one indicted under the Habitual Criminal Act

should be a charge of that Department of the State in one of its penal institutions or in one of its mental hospitals. If, by examination of a psychiatrist, the Welfare Department is of the opinion that the prisoner is a person of unsound mind, the court no doubt would direct an inquest to be held with the result that the prisoner would be committed to a mental institution; thus saving the state the cost of a trial and a probable inquest thereafter. That this was the sole intent of the Legislature in passing the Act may be gathered from subsection (3), where it permits the director of the Department to decline to inquire into the mental condition of the prisoner. It is manifest that the prisoner acquires no right to such an examination under the statute itself. If the court should be of opinion that there are reasonable grounds to believe that the defendant is insane at the time of the trial, it would be his duty to postpone all proceedings and hold an inquest, Criminal Code of Practice, Section 156; or, if there should be testimony introduced tending to show that the defendant was of unsound mind at the time he committed the offense, it would be the duty of the court to give an instruction on insanity. In the instant case, when attention was called to the fact that the Circuit Court Clerk had failed to notify the Department of the indictment, the court deferred sentencing appellant until such notice was given and an examination was held. That examination disclosed that appellant was of sound mind; and, in the hearing on the motion for a new trial, the court specifically, and in open court, asked the attorney for appellant and the latter in person if it was the contention of either that appellant was of unsound mind. Each of them stated that he was making no contention to that effect. Thus, it appears, if the court had erred in placing appellant in jeopardy before notice was given to the Department of Welfare, such error was not prejudicial to the substantial rights of appellant in this case.

The judgment is affirmed.