Sherman CORDER, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Feb. 11, 1955.

Rehearing Denied May 13, 1955.

Duncan & Huddleston, Parker W. Duncan, Bowling Green, George W. Hatfield, Jr., Whitley City, for appellant.

J. D. Buckman, Jr., Atty. Gen., Zeb A. Stewart, Asst. Atty. Gen., for appellee.

CAMMACK, Justice.

Sherman Corder was charged with the willful murder of Arthur Herbert Smith. He was found guilty of voluntary manslaughter and his punishment fixed at 21 years. The only ground urged for reversal is that the court failed to give an instruction on insanity or unconsciousness.

Corder, 63 years of age, had been a peace officer for some 20 years. He was a commissioned, private peace officer for the Stearns Coal and Lumber Company in the town of Stearns at the time the offense was committed. There was no showing of previous criminal or homicidal tendencies. As indicated by an adjudication of the Veterans Administration, evidenced by a letter dated approximately one year before the homicide, Corder was considered disabled to a total and permanent degree because of a heart condition, varicose veins, diabetes, arthritis of the left knee and an artery condition.

During the afternoon of December 7, 1953, Corder and a friend, Lem Perkins, drove to Tennessee in Perkins' automobile and drank some beer. Sometime between seven and eight o'clock that night, Corder entered the store of Leonard Meadows in Pine Knot, Kentucky. At that time, according to Meadows, he asked where he was, although he had lived in McCreary County and within a few miles of Pine Knot most of his life. Meadows, who had been acquainted with Corder for many years, said he did not act normal and that "he acted like he was drunk or something wrong with him." He observed that Corder's pistol was not in his holster. Meadows took Corder home in his car. While going from the store to his car, Meadows observed a one-seated car, with one door open, parked near the store. When he returned to the store

an hour or so later, he looked in the parked car and saw someone lying on the seat. He supposed that the person was drunk and made no effort to arouse him. A pistol was on the seat, which Meadows got and took to the store. The pistol had two empty shells in it and he recognized it as belonging to Corder.

On the morning of December 8th, about 4:45, Corder went to the home of the sheriff of McCreary County and told him that he had had some trouble with Lem Perkins on the previous evening, in the course of which two shots had been fired, and that Perkins may have been killed. He asked the sheriff to go with him to the scene of the trouble and investigate the matter. The sheriff stated that Corder told him that he had killed Perkins.

The sheriff, his son, and Corder went to Pine Knot, where Corder pointed out the car in front of Meadows' store. When the sheriff learned that the occupant of the car was dead he had a jury empaneled and an inquest was held before the body was removed from the car. Corder, who had not seen the body and apparently assumed that it was that of Lem Perkins, testified at the inquest and related that he and Perkins got into an argument about Perkins desiring to go get some whiskey after they returned from Tennessee. He said Perkins grabbed at his gun and two shots were fired while they were scuffling over it. Corder said also that he got out of the car, took what he thought were all the live shells from the pistol, and threw them and the pistol away. He then walked around for a few minutes and went to Meadows' store. We have noted Meadows' testimony relating to Corder's conduct there.

When the body was removed from the car Corder said he learned for the first time that the body was not that of Lem Perkins but that of Arthur Herbert Smith, 18 years of age. The car belonged to Smith's family. Corder was not acquainted with the deceased and had never had any trouble with him or any member of his family.

Corder was placed in jail immediately. He was examined by Dr. M. D. Haley five days later. Dr. Haley found Corder's diabetic condition had advanced to such a stage that the sugar content of the urine was four-plus and the blood count 370. A normal blood count is 100. The doctor expressed the opinion that the condition which he found was of several months' standing and that such conditions were frequently accompanied by diabetic coma or shock. He said that at the time of this examination, Corder, although conscious, did not appear rational. Dr. Haley stated further that persons in a diabetic shock were often able to walk around, but while in that condition had the appearance of a drunken person. By way of avowal, he stated that Corder's diabetes was in the most advanced stage he had ever encountered without being accompanied by complete unconsciousness. Although Corder had known, at least since the adjudication of disability by the Veterans Administration, that diabetes was one of his disabling factors, he was not undergoing any specific treatment for the condition. After the examination by Dr. Haley, he was sent to a hospital where insulin was prescribed.

There is sharp conflict in the testimony of Corder and Lem Perkins. Corder's version of their difficulty, given at the trial, corresponds with his testimony given at the coroner's inquest. Perkins, on the other hand, testified at the trial that he and Corder did not stop at Pine Knot upon their return from Tennessee, but drove about a half a mile down a side road, known as East Apple Tree Road, which is some three or four miles beyond Pine Knot. Perkins related that after he and Corder went down this side road, Corder wanted to go back to Tennessee and get some more beer and when Perkins refused, he pulled his gun. Perkins said he then stopped the car on the pretext of seeing someone. He left Corder in the car and went down the road a short distance. He stated that in a few minutes he heard a car stop near where he had left Corder, and that after the car drove away, he returned to his car and found that Corder was gone. He then got into his car and

drove home. He said no shots were fired during his argument with Corder.

If there is any evidence of substance tending to show that an accused, at the time of his alleged offense, was mentally unbalanced to the extent that he did not know right from wrong, or did not know the nature and quality of his act, an instruction on insanity should be given. Harrod v. Commonwealth, 311 Ky. 810, 226 S.W.2d 4; Maulding v. Commonwealth, 172 Ky. 370, 189 S.W. 251. Furthermore, a person can not be held criminally responsible for acts committed while he is unconscious. Smith v. Commonwealth, Ky., 268 S.W.2d 937. The question in this case resolves itself into one of whether there was sufficient evidence to raise an issue as to Corder's insanity or unconsciousness at the time of the offense. If there was such evidence, the issue should have been submitted to the jury by appropriate instructions.

The only evidence that Corder was insane or unconscious by reason of a diabetic coma, at the time of the offense, is the testimony of Mr. and Mrs. Meadows concerning his actions when he walked into the store, the apparent conflict between his version of the incident and what happened, and the report of the Veterans Administration relative to his physical condition. The doctor's testimony related to his condition five days after the occasion and the letter from the Veterans Administration would tend to show only that he had a diabetic condition. There is not a shred of evidence in the record that *at the time the offense was committed,* Corder was without sufficient reason to know the nature and quality of his act, or had not sufficient reason to know right from wrong. It is not error to refuse an insanity or unconsciousness instruction where such is the case. Webb v. Commonwealth, 312 Ky. 684, 229 S.W.2d 455; Phillips v. Commonwealth, 283 Ky. 141, 140 S.W.2d 1014; Golden v. Commonwealth, 275 Ky. 208, 121 S.W.2d 21.

Judgment affirmed.

SIMS, J., dissenting.

SIMS, Judge (dissenting).

The majority opinion correctly states the facts and likewise the law. Its error, in my judgment, is in applying these undisputed facts to a simple rule of law and then reaching an unsound and illogical conclusion. To me the error is so manifest that I cannot let it pass without registering the reasons for my inability to agree with my learned brethren.

I cannot state the law more clearly or more concisely than does the majority opinion. Nor can I make the facts stand up and cry out in any louder tones for the correct application of the rule than does the majority opinion. I will forego the strong temptation to repeat the rule and to restate the facts, which so convincingly show that in applying them to the rule the court should have submitted to the jury under an appropriate instruction the question of whether or not accused at the time of the killing was mentally unbalanced to the extent that he did not know the nature and quality of his act, or had not sufficient reason to know right from wrong.

As strange as it may seem in the face of the testimony, the majority of the court say there is not a shred of evidence in the record that at the time the offence was committed accused was without sufficient reason to know the nature and quality of his act, or had not sufficient reason to know right from wrong.

It is difficult to see how the majority could have overlooked the rule that proof of insanity of accused a reasonable length of time before or after the crime is competent evidence to submit to the jury to enable it to determine whether or not the same condition of mind existed at the time the crime was committed. I say this because their attention was called to Sharp v. Com., 308 Ky. 765, 215 S.W.2d 983, where the rule is plainly stated, as well as other authorities to the same effect. Unfortunately, the majority do not appear to understand that the question of whether or not accused was of unsound mind at the time of the killing was for the jury's determination under a proper instruction and not a question of law for this court to determine.

If the majority opinion should be followed in the future, and I sincerely hope it will not be, I cannot understand how in any criminal case a question of an accused's sanity can be submitted to a jury, unless he is examined by a score of physicians either a few minutes preceding or a few minutes succeeding the crime and such physicians pronounce him insane. According to the majority opinion, the testimony of one physician who examined accused five days after the crime and found him irrational from a diabetic condition which had existed for several months and in the most advanced stage the doctor had ever encountered without being accompanied by a complete unconsciousness, was not sufficient to require an insanity instruction; even though fortified by lay testimony that accused was lost in his own community immediately after the shooting, and the next day said he had shot a friend, when his victim was a complete stranger.

For the reasons given I most respectfully dissent.